Peter R. Afrasiabi, Esq. (Bar No. 193336)
Email: pafrasiabi@onellp.com
Christopher Arledge, Esq. (Bar No. 200767)
Email: carledge@onellp.com
John Tehranian, Esq. (Bar No. 211616)
Email: jtehranian@onellp.com
**ONE LLP**
4000 MacArthur Boulevard
West Tower, Suite 1100
Newport Beach, CA 92660
Phone:      (949) 502-2870
Facsimile:  (949) 258-5081

Attorneys for Plaintiff, Mavrix Photographs LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MAVRIX PHOTOGRAPHS LLC, a California limited liability company,<br><br>    Plaintiff,<br>v.<br><br>LIVE JOURNAL, INC.; and DOES 1-10, inclusive,<br><br>    Defendants. | Case No.: SACV13-00517 CJC (JPRx)<br><br>**OPPOSITION TO DEFENDANT LIVEJOURNAL INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date:   August 5, 2013<br>Time:   1:30 p.m.<br>Place:  Courtroom 9B<br>Judge:  Hon. Cormac J. Carney |

---

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   DEFENDANT'S BUSINESS MODEL IS BASED ON ENCOURAGING USERS TO UPLOAD INFRINGING MATERIAL TO ITS WEBSITE ................ 1

III.  MAVRIX HAS SATISFIED ITS PLEADING OBLIGATIONS ............................ 4

    A.  There is no confusion as to what is being alleged ...................................... 4

    B.  LiveJournal improperly asks this Court to decide issues of fact at the pleadings stage ............................................................................... 4

    C.  Mavrix has pled direct copyright infringement ......................................... 5

    D.  Mavrix has pled secondary liability ........................................................... 6

        1.  *Fonovisa* controls here ...................................................................... 6

        2.  *Luvdarts* does not change the analysis ............................................. 9

IV.  CONCLUSION ................................................................................................. 11

# **TABLE OF AUTHORITIES**

Cases

*Arista Records LLC v. Myxer Inc.*,
  2011 U.S. Dist. LEXIS 109668 (C.D. Cal 2011) ............................................................... 6

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ........................................................................................ 6, 7, 8

*Luvdarts, LLC v. AT&T Mobility, LLC*,
  710 F.3d 1068 (9th Cir. 2013) ............................................................................................ 9

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146, 1159 (9th Cir. 2007) .................................................................................. 5

*Perfect 10, Inc. v. Giganews, Inc.*,
  2013 U.S. Dist. LEXIS 71349 (C.D. Cal. 2013) ................................................................ 5

*Sony Corporation of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ........................................................................................................... 9

*Warner Bros. Ent't, Inc. v. WTV Sys.*,
  824 F.Supp.2d 1003, 1011 n.7 (C.D. Cal. 2011) ............................................................... 6

Statutes

17 U.S.C. §106 ........................................................................................................................ 5

Fed. R. Civ. Proc. 12(b)(6) ..................................................................................................... 5

Fed. R. Civ. Proc. 56 .............................................................................................................. 5

I. INTRODUCTION

LiveJournal's motion attacks an imaginary complaint. It argues that no direct allegation has been made against it, and LiveJournal expresses bewilderment as to why it was even sued here: it seems to be simply because it "owns and operates" a website that it lacked any substantial control over, and it lacks any knowledge as to what it has done – as opposed to what independent third parties have done – that could possibly constitute infringement.

All of this is nonsense. As is set forth in paragraph 18 of the complaint, LiveJournal has built a business around encouraging mass infringement by users, and through the LiveJournal employee who runs the site, it directly orchestrates all that goes on. This is not, as LiveJournal implies, a case where independent third parties might occasionally post infringing material without LiveJournal's knowledge or participation. The infringing acts – thousands of them – are done at LiveJournal's specific direction. LiveJournal's employee operates the website, creates the rules for the website, moderates the website, decides what gets posted, and how, what stays and what is removed. And his rules only allow posts that are virtually certain to be copyright infringements by, among other things, only allowing posts that take full articles from other websites so they can be reproduced on LiveJournal's site.

You cannot build a business around encouraging third parties to upload infringing material to your website and then demand that a court rescue you from the consequences of your mass infringement on a Rule 12(b)(6) motion.

II. DEFENDANT'S BUSINESS MODEL IS BASED ON ENCOURAGING USERS TO UPLOAD INFRINGING MATERIAL TO ITS WEBSITE

LiveJournal describes its business as "a web-based social media platform" that allows "its users" to "create and contribute to group journals called 'communities.'" Motion at 1. LiveJournal says that the website in question, Oh No They Didn't! ("ONTD!"), "is one such community" and that "the content available on ONTD! is generated and uploaded by LiveJournal users." *Id.*

1

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

LiveJournal does concede that it owns the ONTD! website, and LiveJournal has publicly demonstrated its ownership over the site by, among other things, obtaining federal trademark registrations on ONTD and Oh No They Didn't!. *See* Request for Judicial Notice, Exh. A.  Even so, LiveJournal tries to distance itself from what takes place on the site, arguing that the complaint fails to allege any facts that LiveJournal itself "'actively engage[d] in' or 'directly cause[d]' any alleged infringement." Motion at 2.  LiveJournal denies that it engages in any volitional conduct related to the content that appears on ONTD!, and LiveJournal denies that it has the right and ability to supervise the content placed on the site. *Id.*  LiveJournal asserts that it is "implausible" that LiveJournal employees were in any way involved in infringing activities. *Id.* at 12.  LiveJournal therefore expresses confusion over what it possibly could have done to justify a claim of copyright infringement, as the content is placed by users and not LiveJournal. *Id.* at 6.

What LiveJournal fails to tell this Court, but what is set forth in Paragraph 18 of the complaint, is that – "implausible" or not – ONTD! is not overseen by third parties at all, but is actually run by a LiveJournal employee.  That employee, Brenden Delzer, was hired by LiveJournal to moderate ONTD!.  *See* Declaration of Christopher Arledge ("Arledge Decl."), Exh. 1.[1]  He works full-time for LiveJournal out of its San Francisco office. *Id.*  LiveJournal identifies Mr. Delzer as an employee on its website. *Id.* at Exh. 2.  LiveJournal is simply not being forthcoming with this Court about its role.

/ / /

/ / /

/ / /

/ / /

---

[1] The facts submitted as part of the Arledge Declaration are not necessary to defeat the current motion, as the existing allegations are more than sufficient.  But should the Court wish to see additional factual allegations in the complaint, all such facts could and would be included in a First Amended Complaint.

Moreover, Mr. Delzer, the LiveJournal employee operating ONTD!, has made clear in the mass media that he is the person who sifts through hundreds of submissions per day to choose which ones to post.  Arledge Decl., Exh. 1.  He claims to have a hand in each of the articles that is posted on the site daily.  *Id.*  Mr. Delzer's comments are supported by the rules section of ONTD!, which makes clear that ONTD!'s moderators comb the site to delete content that is not fresh, interesting, or otherwise in conformance with the site's rules, as well as to ban those who post such items.  Townsend Decl., Exh. E at 28 (posters will be banned for racism and other forms of discrimination, and posts will be removed if the material has already been posted), at 29 (material without a direct source will be rejected, posts with hotlinks will be rejected, spam will be deleted and will get the user banned), at 30 (interpersonal conflict will result in a ban, and violation of the other rules – of which there are many – can result in a ban).

Those rules also make clear that, while LiveJournal pretends that it has no actual role in what is posted on the site, it actually gives very clear direction to users as to what can and cannot be posted.  Indeed, one of the requirements virtually guarantees that users will post infringing material.  ONTD! tells its users, "Don't be lazy with your posts. Include the article and picture(s) in your posts…do not simply refer us off to another site for the goods."  Townsend Decl., Exh. E at 29.  In other words, users are not permitted merely to discuss celebrity events on ONTD!.  Mentioning, for example, that Britney Spears is recording an album is, in ONTD!'s view, "lazy."  It is also "lazy" and therefore against the site's rules to provide a link to an article on another website discussing Ms. Spears or another celebrity.  What ONTD! demands from its users is that they copy entire articles and accompanying pictures appearing on other websites and paste them in-full onto ONTD!.  Failing to copy other people's articles in full may well be "lazy"; but doing so is virtually certain to involve copyright infringement.

In light of these undisputed facts, LiveJournal's opposition brief is more than a little disingenuous.  LiveJournal is confused why it is being blamed for copyright infringement? Maybe because its employee runs a site full of infringing material, decides what will be

3

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

posted and what will not, and gives specific instructions that people are to lift articles and pictures from other sites for ONTD!. LiveJournal bases its entire business model on encouraging and capitalizing from copyright infringement. There is no mystery why LiveJournal is here.

### III.  MAVRIX HAS SATISFIED ITS PLEADING OBLIGATIONS

####   A.   There is no confusion as to what is being alleged

LiveJournal argues the complaint is deficient under Rule 8 because LiveJournal can't possibly understand what is being alleged against it. LiveJournal essentially argues that it's impossible to discern which infringing acts are being performed by LiveJournal and which are being performed by third-party users – an argument that rests on a disingenuous assertion that it has no real involvement in what is posted on ONTD!. But Paragraph 18 of the complaint addresses this issue squarely:

> Defendants have willfully infringed, and unless enjoined, will continue to infringe Mavrix's copyrights by knowingly reproducing, displaying, distributing, and utilizing the Photos by, among other things, virtue of Defendants' employees' creation of the Website and establishment and continual moderation and management of the Website's rules that expressly request, encourage and foster infringement by, among other things, specifically asking people to upload third party copyrighted celebrity-based content and third-party copyrighted celebrity photographs from content owners' websites and other sources around the internet.

LiveJournal is not confused. The complaint fails to distinguish between user uploads and LiveJournal because, as is alleged, there is no distinction. Users upload what LiveJournal tells them to upload, and LiveJournal monitors the site constantly to make sure users have followed their clear directions. Material that appears on ONTD!—including infringing material—is there because LiveJournal has decided it should be there.

####   B.   LiveJournal improperly asks this Court to decide issues of fact at the pleadings stage

LiveJournal takes issue with Mavrix's allegation that ONTD!'s rules encourage the uploading of copyright infringing material. LiveJournal says it is "implausible" that LiveJournal employees would be engaged in any such activities, and LiveJournal submits

the ONTD! rules for this Court's analysis, asserting that the rules undercut Mavrix's allegation. Motion at 12. LiveJournal's request that this Court analyze material outside the record on a Rule 12(b)(6) motion is improper, but Mavrix does not object to the request. Mavrix does, however, object to LiveJournal's request that this Court weigh in at this early stage on the factual question of whether these rules encourage infringement. LiveJournal's request to interpret these outside-the-pleading rules would, at best, be appropriate only on a Rule 56 motion, and, in light of the evidence that LiveJournal requires users to upload entire articles from other websites, LiveJournal could not win a Rule 56 motion either. Quite simply, a trier of fact could conclude that when LiveJournal tells third parties to find complete articles and pictures from other websites and post those materials on ONTD!, LiveJournal is encouraging users to post infringing material. This Court cannot conclude at the pleadings stage to the contrary, and LiveJournal is wrong to invite it to do so.

### C. Mavrix has pled direct copyright infringement

A plaintiff pleads direct copyright infringement by pleading (1) that it owns copyrighted material and (2) that defendant engaged in an act of copying the material. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007). "Copying," as LiveJournal notes, is shorthand for infringing any of the plaintiff's exclusive rights in the content: the rights to reproduce, distribute, publicly display, perform, or create derivative works. Motion at 7 (citing 17 U.S.C. §106).

Here, Mavrix pleads ownership of the material. Complaint at ¶ 12. Mavrix also alleges that LiveJournal copied the material by reproducing, distributing, and publicly displaying the material on its website. *Id.* at ¶¶ 9, 14, 16. Thus, Mavrix has pled direct infringement. This is a simple question.

LiveJournal says the analysis is more complicated, however, because Mavrix has not pled facts showing "some element of volition or causation." Motion at 7. LiveJournal bases its argument on *Perfect 10, Inc. v. Giganews, Inc.*, 2013 U.S. Dist. LEXIS 71349 (C.D.Cal. 2013), where Judge Matz required an allegation of volition to state a claim of

5

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

direct infringement against a USENET service. Judge Matz concluded that the USENET service was little more than a public copy machine that allowed third parties to copy anything and everything – infringing or non-infringing – that they wanted. Thus, the copying was done by the third parties and not the defendant, and the defendant did not directly infringe. (Judge Matz did find that the plaintiff had pled secondary liability, however.)

The viability of the volition doctrine is an open question. Judge Matz himself noted that the doctrine has never been adopted by the Ninth Circuit and has been rejected by a number of Central District judges, including Judges Feess and Walter. *See Arista Records LLC v. Myxer Inc.*, 2011 U.S. Dist. LEXIS 109668 at *48-49 and *Warner Bros. Ent't, Inc. v. WTV Sys.*, 824 F.Supp.2d 1003, 1011 n.7. In any event, this Court need not wade into that morass, because Mavrix satisfies even Judge Matz's view that some volition is required for direct infringement. This is not a case where LiveJournal simply made available technology that would allow third parties to copy for themselves whatever material they saw fit. This is a case where LiveJournal told third party users exactly what they should copy, what format it should be in, what type of content would be permitted, and it reproduced, distributed, and publicly displayed only the desired material. LiveJournal did not make a copy machine available in a public place; it stood by the copy machine, told third parties what they should and should not copy, and then displayed the desired material – and only the desired material – on a bulletin board for the world to see.

**D.     Mavrix has pled secondary liability**

LiveJournal argues that Mavrix has failed to plead a viable claim of secondary liability, whether of the vicarious or contributory variety. LiveJournal is wrong, but the argument requires some unpacking.

**1.     *Fonovisa* controls here**

The seminal case in the Ninth Circuit on secondary liability for copyright infringement is *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), a case LiveJournal does not discuss. In *Fonovisa*, the defendant, Cherry Auction, owned a swap

6

meet. Third-party vendors paid Cherry Auction a fee for the right to sell product at the swap meet. Cherry Auction did not directly sell any product, and it did not get a percentage of sales. Certain vendors at the swap meet routinely sold copyrighted recordings belonging to the plaintiff, Fonovisa, without a license. Cherry Auction was aware that infringing sales were taking place. Fonovisa sued Cherry Auction under the Copyright Act for vicarious and contributory infringement. Cherry Auction moved to dismiss before the trial court, and the trial court granted the motion. The Ninth Circuit reversed.

On vicarious liability, the court found facts sufficient to state a cause of action because Cherry Auction (1) had sufficient control over the swap meet to end the infringing activities and (2) directly benefitted from those activities. Cherry Auction had control because it "had the right to terminate [those engaged in the infringement] for any reason whatsoever and through that right had the ability to control the[ir] activities." *Fonovisa*, 76 F.3d at 262. It was irrelevant that Cherry Auction was not actively involved in sales and did not supervise the individual employees. *Id.*

Cherry Auction also directly benefitted because, although it did not receive a commission tied to sales, it still received a financial benefit from the infringement because the infringing sales "enhance[d] the attractiveness of the venue to potential customers" and were thus a "draw." *Id.* at *263*.

The case against LiveJournal is stronger than the successful case against Cherry Auction. LiveJournal controls who has access to the website and has the right – which it claims to exercise – to terminate users and/or delete posts. Indeed, LiveJournal exercises far more control over the ONTD! website than Cherry Auction did over the swap meet in that they encourage users to upload particular content and have personal knowledge of each and every post. This level of control goes far beyond anything exercised by Cherry Auction.

LiveJournal also satisfies the second element of vicarious liability because it receives a direct financial benefit. As in *Fonovisa*, the infringing activity draws customers,

7

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

and those customers lead to revenues. Indeed, while there is no indication that the infringing material was the primary draw for customers in *Fonovisa*, infringing material appears to be the primary draw to the ONTD! It must be; LiveJournal is dedicated to celebrity news, and the site rules require posters to upload entire articles from other sites. The vast majority of content on the site, then, consists of articles and pictures from other websites. Obviously, web traffic is driven by the bulk of the content on the site. LiveJournal is vicariously liable.

LiveJournal is also contributorily liable. As in *Fonovisa*, LiveJournal directly contributes to third parties' infringement with knowledge of the infringement. The required knowledge is not knowledge of a specific infringing act – there is no allegation of such specific knowledge in *Fonovisa* – but rather knowledge of rampant infringement. Defendants here have such knowledge. Their entire business model is based on infringing uploads, and Defendants review each infringing work as it is uploaded.

Thus, as in *Fonovisa*, contributory infringement is established if LiveJournal "materially contributed to the infringing activity." In *Fonovisa*, the defendant did so by providing the space where the infringing activity could happen. "[I]t would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet [including] the provision of space, utilities, parking, advertisement, plumbing, and customers." 76 F.3d at 264. Cherry Auction provided "the environment and the market for counterfeiting recording sales to thrive." *Id.* It was irrelevant that Cherry Auction did not "expressly promote[] or encourage[] the sale of counterfeit products, or in some manner protected the identity of the infringers." *Id.* "[P]roviding the site and facilities for known infringing activity is sufficient…." *Id.*

Here, LiveJournal has clearly provided the facilities for known infringing activity. But its activities go well beyond such contributions, and LiveJournal would be liable even under a much-stricter legal regime as LiveJournal does, in fact, "expressly promote and encourage" infringement. LiveJournal is liable for contributory infringement. Thus, Mavrix has pled secondary liability.

### 2. *Luvdarts* does not change the analysis

LiveJournal tries to escape this straight-forward application of the longstanding *Fonovisa* precedent by citing to *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068 (9th Cir. 2013), and arguing that Mavrix must allege specific knowledge of the specific infringements at issue in this case. Motion at 10. That is not the law.

It is worth noting that there is nothing new or important about *Luvdarts*. The opinion itself is short and does not suggest that it is resolving any novel issue of copyright law. The case is nothing more than a clear application of a body of law developed by the United States Supreme Court in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), which articulated the standards for applying secondary liability principles to the manufacturers of new technologies. *Sony*, of course, is the seminal decision dealing with secondary liability for copyright infringement for VCR manufacturers. The plaintiffs' argument was clear: the manufacturers know that their product can be used to infringe, and therefore they cannot be free of responsibility when that infringement occurs. The Court disagreed, noting that the device in question could be used for substantial non-infringing uses as well as infringing uses, and that the sale of copying equipment under such circumstances does not constitute contributory infringement. *Id.* at 442.

The Court's ruling was a logical extension of the secondary liability principles discussed in *Fonovisa* to new technologies. A VCR is capable of being used for infringing and non-infringing uses. This is not unlike a swap meet booth, which can be used to sell infringing or non-infringing products. But the mere fact that a swap meet booth can be used to sell infringing items does not subject the manufacturer of swap meet booths to copyright liability. Nor would the owner of the swap meet in *Fonovisa* have been subject to liability simply because it was aware that its location or booths could have been used to sell infringing materials. Rather, the owner was liable because it knew the infringement was widespread, it had the ability to stop the infringement, and it did not.

///

*Ludvarts* simply applied this established principle, originally applied to VCR manufacturers, in a non-controversial manner to a different technology: MMS networks, which allow mobile phones to send and receive messages. Just like the makers of VCR's, the makers of MMS networks clearly know that the networks are capable or infringing and non-infringing uses, but that fact alone is not enough to establish secondary liability. Making a "copying" machine, whether a Xerox machine, a VCR, or a computer network, that is capable of substantial non-infringing uses in addition to infringing uses does not expose the manufacturer to liability.

This is why the court focused on the defendant's knowledge (or lack of knowledge) in *Ludvarts*. Without some evidence that the defendant engaged in something more than the mere making of a device that allowed "copying," there could be no secondary liability. And the plaintiff in *Ludvarts* could show nothing more.

So the real question here is why LiveJournal believes *Ludvarts*'s simple application of the *Sony* doctrine has any application to this case. LiveJournal is not the maker of a "copying" machine that is operated solely by third parties and can be used by those unknown third parties for either infringing or non-infringing uses. LiveJournal runs a website, making editorial decisions on a day-to-day basis and always with knowledge of what material appears on the site. Needless to say, VCR manufacturers stood in a much different position; there was no evidence that Sony employees were standing in America's living rooms giving direction as to what programs should be taped and how the recorded programs should be distributed or displayed.

LiveJournal is not Sony, and it is not a maker of MMS networks like AT&T. LiveJournal is the online equivalent of the owner of the swap meet in *Fonovisa*. It knows that its website is full of infringing material – it sees the infringing material on a daily basis – it has the ability to stop the infringement, and it doesn't. Indeed, it adopts and enforces rules that encourage, even require, users to infringe. That level of knowledge is more than enough to establish secondary liability.

///

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COMPLAINT**

It is not also necessary that Mavrix allege LiveJournal's actual knowledge of any specific act of infringement.  The plaintiffs in *Fonovisa* prevailed by showing that the owner knew about widespread infringement.  The plaintiffs did not allege – and were not required to allege – that the swap meet owner knew that Julio Iglesias's debut album *Yo Canto* was sold on February 2, 1984 at Booth 19 to customer Jane Doe.  That level of specificity is not and never has been required, and LiveJournal is wrong to assert that it is required here.  Knowledge of widespread infringement is enough.  LiveJournal has such knowledge.[2]

## IV. CONCLUSION

Because Mavrix has adequately pled its claims, LiveJournal's motion to dismiss should be denied.  But if the Court is inclined to grant LiveJournal's motion for some reason, Mavrix asks for an opportunity to amend its complaint.

Dated: July 8, 2013                                    **ONE LLP**

By: */s/ Christopher W. Arledge*
    Christopher W. Arledge
    Attorneys for Plaintiff,
    Mavrix Photographs LLC

---

[2] The knowledge required to establish secondary liability may or may not be different than the level of knowledge necessary to defeat a DMCA safe-harbor affirmative defense by a defendant who may otherwise be entitled to such a defense.  *See* 17 U.S.C. § 512(c)(1)(A) (finding the safe harbor for "information residing on systems or networks at direction of user" in applicable where the defendant has "actual knowledge" of infringing material or is "aware of facts or circumstances from which infringing activity is apparent.").  At the pleadings stage, Mavrix need not plead facts to overcome all possible affirmative defenses, so issues concerning the knowledge required to defeat a DMCA safe-harbor defense are not ripe, and case law discussing such issues is not relevant to the motion currently before this Court.