GIBSON, DUNN & CRUTCHER LLP
Wayne Barsky, SBN 116732
wbarsky@gibsondunn.com
Katie Townsend, SBN 254321
ktownsend@gibsondunn.com
2029 Century Park East
Los Angeles, California 90067-3026
Telephone: (310) 552-8500
Facsimile: (310) 551-8741

*Attorneys for Defendant
LiveJournal, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MAVRIX PHOTOGRAPHS LLC**, <br><br> Plaintiff, <br><br> v. <br><br> **LIVEJOURNAL, INC.; and DOES 1 through 10, inclusive**, <br><br> Defendants. | CASE NO. 13-CV-00517-CJC (JPR) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT** <br><br> [Notice of Motion and Motion for Summary Judgment, Statement of Uncontroverted Facts and Conclusions of Law, Supporting Declarations of Brenden Delzer, Mark Ferrell and Katie Townsend, Request for Judicial Notice, and [Proposed] Judgment Filed Concurrently Herewith] <br><br> Date:   August 4, 2014 <br> Time:  1:30 p.m. <br> Place:  9B <br> Judge:  Hon. Cormac J. Carney <br><br> Pretrial Conference: 9/15/14 <br> Trial:  9/23/14 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I.     Introduction ..................................................................................................... 1

II.    Applicable Legal Standards............................................................................ 3

III.   The Safe Harbor Provisions Of The DMCA .................................................. 4

IV.    Factual Background ........................................................................................ 5

       A.    LiveJournal's Business Model ............................................................. 5

       B.    The ONTD! Community ....................................................................... 6

       C.    Plaintiff And Its Lawsuit Against LiveJournal ................................... 8

V.     The Uncontroverted Facts Establish That LiveJournal Is Entitled To The
       Safe Harbor Of Section 512(c) ....................................................................... 9

       A.    LiveJournal Is An Online "Service Provider" ................................... 10

       B.    LiveJournal Satisfies Both Threshold Requirements Of Section
             512(i) .................................................................................................. 11

             1.    LiveJournal Has Adopted And Reasonably Implements A
                   "Policy That Provides For The Termination In Appropriate
                   Circumstances" Of Users "Who Are Repeat Infringers" ............. 11

             2.    LiveJournal "Accommodates And Does Not Interfere With"
                   "Standard Technical Measures" Used By Copyright Owners
                   To Identify Infringing Material.................................................... 11

       C.    Each Of The Requirements For Application Of The Safe Harbor Of
             Section 512(c) Is Met Here ................................................................. 12

             1.    LiveJournal Expeditiously Removes Or Disables Access To
                   Infringing Material On Its Service In Response To DMCA
                   Take-Down Notices ..................................................................... 13

             2.    The Undisputed Facts Establish That When LiveJournal
                   Received Notice Of The Claimed Infringement Alleged In
                   The FAC It Promptly Disabled Access To The Six User-
                   Generated Posts At Issue .............................................................. 14

             3.    LiveJournal Lacks The "Right Or Ability To Control The
                   Infringing Activity" And Does Not Receive "A Financial
                   Benefit Directly Attributable To That Infringing Activity........... 16

VI.    Conclusion .....................................................................................................20

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

1

# TABLE OF AUTHORITIES

2

Page(s)

3

## Cases

4

5

*In re Aimster Copyright Litig.*,
252 F.Supp.2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003).............. 10

6

*Celotex Corp. v. Catrett*,
477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) ......................... 3

7

8

*Columbia Pictures Indus. v. Gary Fung*,
710 F.3d 1020 (9th Cir. 2013) ................................................. 19

9

*Hendrickson v. Ebay, Inc.*,
165 F. Supp. 2d 1082 (C.D. Cal. 2001) ................................... 4, 10

10

11

*Io Group, Inc. v. Veoh Networks, Inc.*,
586 F. Supp. 2d 1132 (N.D. Cal. 2008)........................... 4, 5, 16

12

*Musick v. Burke*,
913 F.2d 1390 (9th Cir. 1990) ............................................ 3, 4

13

14

*Perfect 10 v. CCBill*,
488 F.3d 1102 (9th Cir. 2007) ................................... 5, 15, 20

15

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
213 F. Supp. 2d 1146 (C.D. Cal. 2002)........................... 17, 19

16

*Scott v. Harris*,
550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ...................... 4

17

18

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*,
809 F.2d 626 (9th Cir. 1987) ....................................... 3

19

20

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
620 F. Supp. 2d 1081 (C.D. Cal. 2008)............................. 1, 5, 13

21

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
665 F. Supp. 2d 1099 (C.D. Cal. 2009)............................. 4, 14–17

22

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
718 F.3d 1006 (9th Cir. 2013) ............................... 4, 10, 15–18

23

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) .............................................. 16, 17

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

## Statutes

17 U.S.C. § 512(c) ................................................................................*passim*

17 U.S.C. § 512(i) ................................................................................10, 12

17 U.S.C. § 512(k) .....................................................................................10

Fed. R. Civ. P. 56 ........................................................................................3

## Other Authorities

3-12B Nimmer on Copyright § 12B.04 (2009) .......................................4, 15

H.R. Rep. 105–551(II), 105th Cong., 2d Sess. ..................................1, 5, 19

S. Rep. 105–190, 105th Cong., 2d Sess. ........................................2, 4, 5, 15

## I.      Introduction

This lawsuit involves six instances of alleged copyright infringement by third-party users of an online social media service hosted by LiveJournal, Inc. ("LiveJournal").  The Digital Millennium Copyright Act ("DMCA")—the statutory regime enacted by Congress as a means to efficiently and "appropriately balance[ ] the interests of content owners, online and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet"—insulates eligible online service providers like LiveJournal from monetary liability for *precisely* this type of claimed infringement.[1]  Because the robust protection of the DMCA "safe harbor" codified in 17 U.S.C. § 512(c), which shields online service providers from claims for damages for copyright infringement resulting from content uploaded by users, is fully applicable here, summary judgment should be entered in LiveJournal's favor.

LiveJournal operates a free, web-based social media, blogging, and community publishing platform (www.livejournal.com) with millions of active users worldwide. In addition to providing those users with a means to create, maintain and share personalized online "journals," LiveJournal's service fosters communication and social interaction by, *inter alia*, allowing users to create and contribute to group journals called "communities."  LiveJournal's online service is home to more than 16.6 million personal journals and user-driven communities, and the content hosted by LiveJournal's service—which is generated and uploaded by its users—is as diverse as the interests of its sprawling, global membership.[2]

---

[1]  *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1090 (C.D. Cal. 2008) (*UMG Recordings I*) (citing H.R. Rep. 105–551(II), 105th Cong., 2d Sess. at 21).

[2]  *See* Uncontroverted Facts Nos. 1–7, 14–18, 212 (hereinafter "U.F.") in LiveJournal's concurrently filed Statement of Uncontroverted Facts and Conclusions of Law.

Gibson, Dunn & Crutcher LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

Oh No They Didn't! ("ONTD!") is one of the countless communities hosted by LiveJournal where users post and comment on written entries, videos, photographs and other material.  U.F. 3–7, 72, 87.  Created by a user in 2004, ONTD! is organized around a shared interest in pop culture and celebrity news and, like other communities within LiveJournal, its purpose is to serve as a forum for dialogue among its many members.  U.F. 73, 75, 85–87, 213, 219–21.  Each week, members of ONTD! upload approximately 600–700 new posts for discussion, and many thousands of user comments to http://ohnotheydidnt.livejournal.com/.  U.F. 76–79.

Mavrix Photographs LLC ("Plaintiff")—an entity formed solely to pursue copyright litigation—alleges that LiveJournal is liable for infringing copyrights allegedly owned by Plaintiff in six sets of photographs of celebrities, portions of which appeared in six posts uploaded to ONTD! by LiveJournal users between July 19, 2010 and April 29, 2013.  *See* First Amended Complaint, ECF No. 17 ("FAC"), Exs. 1–6; U.F. 151–88.  Ignoring the "notice and take-down" procedure of the DMCA—the centerpiece of the statutory system designed by Congress "to provide greater certainty" to online service providers like LiveJournal, Facebook, YouTube, and countless others, "concerning their legal exposure for infringement," S. Rep. 105–190, 105th Cong., 2d Sess. at 8—Plaintiff proceeded to litigate these claims without giving *any* advance notice, whatsoever, to LiveJournal that any of the six user-generated posts at issue purportedly infringed any copyright of Plaintiff's.  U.F. 154–94.  Indeed, that Plaintiff waited to take any action with respect to six instances (over an approximately three-year period) of allegedly infringing user-generated content hosted by LiveJournal, and that it filed this lawsuit as a matter of *first* resort, not only undermines the intent of Congress when it enacted the DMCA, it also underscores why summary judgment is warranted here.  S. Rep. 105–190, at 8.

As set forth herein, the uncontroverted facts establish that LiveJournal is entitled to the safe harbor of 17 U.S.C. § 512(c)—which protects qualifying online service providers from liability for all monetary relief for infringement "by reason of the

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." LiveJournal is _exactly_ the type of online service provider that this DMCA safe harbor was meant to protect. The undisputed evidence establishes that LiveJournal not only expressly prohibits users—through its Terms of Service—from engaging in infringing activity, it has adopted and enforces policies and procedures to respond expeditiously and effectively to notices (both formal and informal) of claimed infringement by users of its service. Had Plaintiff given notice to LiveJournal of any of the claimed infringement alleged prior to filing this lawsuit, LiveJournal would have promptly disabled access to that user-generated material pursuant to those policies. Indeed, it is undisputed that after learning of that claimed infringement—through Plaintiff's pleadings in this lawsuit—LiveJournal quickly disabled access to that material. U.F. 158, 165, 172, 179, 186, 193. As set forth in detail herein, because there is no genuine issue as to any material fact that would make Section 512(c) inapplicable to Plaintiff's claims, summary judgment should be entered.

## II.    Applicable Legal Standards

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material only if it is relevant to a claim or defense and its existence might affect the suit's outcome. _See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc._, 809 F.2d 626, 630 (9th Cir. 1987). A moving party's burden to demonstrate the absence of a genuine issue of material fact for trial is "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." _Celotex Corp. v. Catrett_, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); _see Musick v. Burke_, 913 F.2d 1390, 1394 (9th Cir. 1990). The moving party has no

burden to negate or disprove matters on which the opponent will have the burden of proof at trial. *Musick*, 913 F.2d at 1394.

A plaintiff opposing summary judgment may not rest on its pleadings, Fed. R. Civ. P. 56(e), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). A "mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment. *Hendrickson v. Ebay, Inc.*, 165 F. Supp. 2d 1082, 1086-1087 (C.D. Cal. 2001). To avoid summary judgment here, Plaintiff "must introduce some 'significant probative evidence tending to support the complaint.'" *Id.*; *see also Scott*, 550 U.S. at 380.

While there "is no dispositive decision on the burden of proof" where summary judgment is sought on the basis of Section 512(c), courts have looked to "David Nimmer's authoritative treatise" for guidance, which states in pertinent part:

> Given that all of Section 512's limitations of liability constitute affirmative defenses, the service provider must prove its eligibility. But a service provider who offers competent testimony that it lacked actual knowledge shifts the burden of proof to the plaintiff to negate those claims. That last proof usually represents an insuperable hurdle for the plaintiff. . . .

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1107 n.11 (C.D. Cal. 2009) (*UMG Recordings II*) (citing 3-12B Nimmer on Copyright § 12B.04 n.41 (2009)), order granting summary judgment on the basis of Section 512(c) safe harbor affirmed by *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 718 F.3d 1006, 1019 (9th Cir. 2013) ("*Veoh*").

## III.    The Safe Harbor Provisions Of The DMCA

Congress enacted the DMCA in 1998 to "facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age." *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1141–42 (N.D. Cal. 2008) (citing S. Rep. 105–190, at 1–2 (1998)). To that end, Congress recognized the need to limit online service providers'

liability in order to "ensure[] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." S. Rep. 105–190, at 8. Accordingly, Title II of the DMCA—the "Online Copyright Infringement Liability Limitation Act" ("OCILLA")—codified in 17 U.S.C. § 512, "protects qualifying Internet service providers from liability for all monetary relief for direct, vicarious and contributory infringement." *Id.* at 20.

As the district court in *Io Group* explained, Section 512:

> seeks to preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. . . . [By enacting it,] Congress hoped to provide greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

*Io Group*, 586 F. Supp. 2d at 1141–42 (internal citations omitted).

"The primary mechanism for cooperation in Title II, and in § 512(c) in particular, is the 'notice and take-down' procedure"—a "formalization and refinement of a cooperative process that has been employed to deal efficiently with network-based copyright infringement." *UMG Recordings I*, 620 F. Supp. 2d at 1090-91 (citing S. Rep. 105–190, at 45; H.R. Rep. 105–551(II), at 54.) That procedure, which is central to the statutory scheme envisioned by Congress, "place[s] the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting the infringement—squarely on the owners of the copyright." *Perfect 10 v. CCBill*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("*CCBill*").

## IV.   Factual Background

### A.   LiveJournal's Business Model

LiveJournal's service has millions of active users worldwide and, since it was launched in 1999, has been home to more than 48 million personal journals and communities. U.F. 15. LiveJournal's service is versatile, and designed to give individual users maximum freedom when it comes to expressing themselves. U.F. 6; Ferrell Decl., Ex. A ("Our tools allow our user community to communicate with each

other in immediate and creative ways.")  Self-expression, creativity, and community are among LiveJournal's core values.  And it fosters those values not just in the United States, but globally.  In Russia, for example, LiveJournal hosts more than 80 of the top 100 most popular blogs in the country, and provides its users there, and in other countries in Europe, a rare means of sharing news and communicating freely in parts of the world where the flow of information is typically controlled by the state.  U.F. 17–18; Ferrell Decl., ¶ 14.  Primarily a forum for social interaction and online discussion, LiveJournal is driven by user comments to posts generated by other users in personal journals and communities.  U.F. 81–84, 213–16, 219.  As its former Chief Executive Officer testified in this action:  "[C]ommenting is the lifeblood of LiveJournal."  U.F. 215–16.

Anyone can utilize LiveJournal's award-winning service, and all of its core features—including posting entries and comments, and creating and participating in communities—free of charge.  U.F. 4, 10, 19–20.  LiveJournal also offers users the option of purchasing a "Paid account," which provides certain additional features, such as more options for customizing the look of personal journals and communities and a "@livejournal.com" e-mail forwarding address, among others.  U.F. 11.  In addition to receiving revenue from the sale of Paid accounts and other premium features to users, LiveJournal has received revenue from advertising displayed on its service in both journals and communities.  U.F. 24–26.

**B.     The ONTD! Community**

ONTD! is one of more than 2.6 million active communities hosted by LiveJournal.  U.F. 16, 72.  Created a decade ago by a LiveJournal user, ONTD! currently has more than 99,000 members worldwide.  U.F. 75.  ONTD! is an active community with passionate members.  Users post, on average, 600–700 new posts to the ONTD! community each week, which serve as starting points for community discussion.  U.F. 78.  A single post can generate thousands of comments from within the community.  U.F. 84.  Unique user commentary and active dialogue among

members is the primary purpose of ONTD!, and what draws people to the community. U.F. 81–82, 86, 215–16.  Members of ONTD! post a diverse array of material for discussion.  In addition to generating posts featuring their own original content, members of the ONTD! community also post other non-infringing material, like embedded (i.e., linked) videos.  U.F. 87.

Any community within LiveJournal has the ability to institute its own guidelines for posting and commenting, provided those guidelines are not in conflict with LiveJournal's own Terms of Service.  U.F. 91.  Many communities within LiveJournal have such guidelines.  Craftgrrl (http://craftgrrl.livejournal.com/), a popular community with more than 20,000 members organized around a shared interest in crafts, such as knitting and beading, is an example of a community that has such guidelines.  *See* http://craftgrrl.livejournal.com/profile; U.F. 92.  The community profile for ONTD! likewise sets forth guidelines ("The Rules") for participating in the community.  *See* http://ohnotheydidnt.livejournal.com/profile; U.F. 93.  Those guidelines were developed collectively by members of the community over time.  U.F. 94.

LiveJournal communities, including ONTD!, are driven by passionate and dedicated users.  And, like other communities within LiveJournal, ONTD! has a group of users who voluntarily moderate the discussion within that community by approving (or rejecting) posts uploaded by other users. U.F. 109.[3]  Any moderator who is logged in to LiveJournal's service can approve or reject posts stored in his or her community's queue.  U.F. 111.  Generally speaking, with respect to ONTD!, a moderator will give a post that has been uploaded by another member of the community a cursory review to

---

[3]  LiveJournal communities also have "maintainers."  A community maintainer is a moderator with a few added administrative permissions relative to that community that allow him or her to, for example, add new maintainers, delete posts or comments, and remove or ban users from participating in the community.  U.F. 27–29.

determine whether it is consistent with the basic guidelines of the community before either approving or rejecting it.  U.F. 113.  Moderators do not have the ability to modify or edit a post uploaded by another user.  U.F. 29.  The user that uploaded the post, however, always retains the ability to edit the content of that post, even after it has been approved by a moderator.  U.F. 120–22.  While many communities within LiveJournal choose not to be moderated, for those that do, moderators serve a valuable role in making the community experience a positive one for their fellow community members by, for example, rejecting posts that are spam, pornographic, or not relevant to the community's interests.  U.F. 125.  There are currently nine moderators of the ONTD! community.  U.F. 103.  Six of those moderators are also maintainers.  *See supra* note 3; U.F. 104.

### C.    Plaintiff And Its Lawsuit Against LiveJournal

Plaintiff is a California limited liability company formed to pursue copyright litigation for the benefit of Gareth Thomas and Chola Reavely-Thomas, the Vice President and President, respectively, and part-owners of Mavrix Photo, Inc. ("Mavrix"), a celebrity photo licensing agency.  U.F. 197–200.  In addition to licensing photos of celebrities taken by freelance photographers, Mavrix also attempts to obtain and register—solely for purposes of litigation—copyrights in certain of the photos it licenses.[4]  Since May of 2010, Mavrix and/or Plaintiff has filed thirty-seven other lawsuits alleging copyright infringement against various online entities.  *See* Request for Judicial Notice ("RJN"); Townsend Decl., Ex. 12–48.

Plaintiff filed this lawsuit in April 2013, alleging that LiveJournal was liable for copyright infringement on the basis of three user-generated posts to ONTD! that included celebrity photos that Plaintiff allegedly licensed to various online and other entities.  U.F. 149.  Not "satisfied" with photos "being taken down" pursuant to the

---

[4]  *See* Townsend Decl., Ex. 2 (Thomas Dep. at 29:5–30, 57:11–21).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S
MOTION FOR SUMMARY JUDGMENT**

notice and take-down procedure created by Congress in the DMCA, U.F. 208, Plaintiff ignored that procedure, and filed this lawsuit without providing any notice to LiveJournal, let alone notice compliant with the DMCA, that these three user-generated posts to a LiveJournal-hosted community infringed any of its copyrights. U.F. 154–172.[5]  Following a successful motion to dismiss by LiveJournal, on August 23, 2013 Plaintiff filed its FAC, which pled new claims of infringement based on three additional user-generated posts.  U.F. 150–52.  Those claims too were asserted for the first time in a pleading, without any advance notice to LiveJournal, and without any effort by Plaintiff to comply with the DMCA.  U.F. 175–94.

## V.   The Uncontroverted Facts Establish That LiveJournal Is Entitled To The Safe Harbor Of Section 512(c)

OCILLA created four "safe harbors" that preclude imposing monetary liability on "service providers" for copyright infringement that occurs as the result of specified activities.  17 U.S.C. § 512.  Section 512(c) sets forth one of those safe harbors.  It states that a "service provider shall not be liable for monetary relief . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider —

(A) (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing; (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material

---

[5]  Since approximately 2009 or 2010, when Mavrix began working with Plaintiff's current counsel, One LLP, neither Plaintiff nor Mavrix has sent a single DMCA "take-down" notice.  *See* U.F. 206–07.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

Gibson, Dunn & Crutcher LLP

that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1).

Under Section 512(i), which applies to all of Section 512's safe harbors, a service provider may be eligible for protection from liability under the DMCA only if it: (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and (B) accommodates and does not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works.  17 U.S.C. § 512(i)(1).

As set forth below, the undisputed facts establish that each of the requirements for application of the safe harbor of Section 512(c) is satisfied here.  Accordingly, summary judgment should be granted in LiveJournal's favor.[6]

### A.    LiveJournal Is An Online "Service Provider"

There can be no dispute that LiveJournal is a "service provider" within the meaning of Section 512(c).  *See* 17 U.S.C. § 512(k) (the "term 'service provider' means," *inter alia* " a provider of online services or network access, or the operator of facilities therefor"); *see also* U.F. 1–7; 212–14.  Providers of a wide range of online services that, like LiveJournal, give users online platforms to communicate and create and share content—including "website hosting companies such as GoDaddy," and "content companies such as MySpace, Facebook, or YouTube," *Veoh*, 2013 U.S. App. LEXIS 5100, at *25 n.8—have been found to meet "the DMCA's broad definition of 'service provider.'"  *Hendrickson v. Ebay, Inc.*, 165 F. Supp. 2d 1082, 1088 (C.D. Cal.

---

[6] Section 512(c) also limits the "injunctive or other equitable relief" that may be awarded to the specific forms of relief set forth in 17 U.S.C. § 512(j).  As the undisputed facts establish, LiveJournal has, among other things, already disabled access to the six user-generated posts identified in the FAC.  *See* U.F. 152–196.  Plaintiff cannot create a triable issue of fact with respect to any demand for injunctive or other relief in this case.

2001); *see also In re Aimster Copyright Litig.*, 252 F.Supp.2d 634, 658 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003) ("A plain reading of [17 U.S.C. § 512(k)] reveals that 'service provider' is defined so broadly that we have trouble imagining the existence of an online service that would not fall under [its] definitions. . . .").[7]

**B.   LiveJournal Satisfies Both Threshold Requirements Of Section 512(i)**

**1.   LiveJournal Has Adopted And Reasonably Implements A "Policy That Provides For The Termination In Appropriate Circumstances" Of Users "Who Are Repeat Infringers"**

Pursuant to LiveJournal's Copyright Abuse Policy—which users and the general public are informed of on www.livejournal.com, U.F. 48–49—LiveJournal terminates the accounts of users who engage in repeat copyright infringement.  While the DMCA provides no definition of "repeat infringer,"  for purposes of implementing its Copyright Abuse Policy, LiveJournal considers a repeat infringer to be a user who (1) re-posts material that LiveJournal has disabled access to in response to a DMCA-compliant notice of claimed infringement without submitting, or attempting to submit, a DMCA-compliant counter-notification; or (2) on three separate occasions has posted material that LiveJournal has disabled access to pursuant to a DMCA-compliant notice of claimed infringement without submitting, or attempting to submit, a DMCA-compliant counter-notification.  U.F. 51–52.  In addition to terminating the accounts of users who meet these criteria, LiveJournal takes additional steps to prevent such users from returning to LiveJournal's service.  U.F. 53–57.

**2.   LiveJournal "Accommodates And Does Not Interfere With" "Standard Technical Measures" Used By Copyright Owners To Identify Infringing Material**

For purposes of the DMCA, "standard technical measures" must meet three

---

[7]   Indeed, Plaintiff concedes that LiveJournal is an online service provider in its pending motion objecting to an order of the Magistrate Judge denying Plaintiff's second motion to compel and awarding sanctions to LiveJournal.  *See* ECF No. 55-1 at 11.

requirements:  (1) they must be "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process"; (2) they must be available on reasonable and nondiscriminatory terms; and (3) they must not impose substantial costs on service providers.  17 U.S.C. § 512(i)(2)(A)–(C).  While, LiveJournal is not aware of any specific "standard technical measures" that meet this statutory definition, it also does not interfere with any technical measures that it is aware of that may be used by copyright holders to identify infringing material uploaded to its service, U.F. 66, or attempt in any way to prevent copyright holders from collecting information needed to issue notices of claimed infringement.  U.F. 62–65.  To the contrary, the undisputed facts demonstrate that LiveJournal makes every effort to work _with_ copyright holders, including by assisting them with submitting DMCA-compliant notices of claimed infringement.  U.F. 71.

## C.    Each Of The Requirements For Application Of The Safe Harbor Of Section 512(c) Is Met Here

Plaintiff's claims against LiveJournal fall squarely within Section 512(c)'s safe harbor for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(c).  Each of the six allegedly infringing posts at issue was uploaded to LiveJournal's service by a user who selected and was responsible for its content.[8]  U.F. 44–48, 123–24.  Once uploaded, each post was automatically stored in a "queue" within LiveJournal's service.  U.F. 110.  It was then approved by one of those moderators—another LiveJournal user—and shared with the entire ONTD! community.  U.F. 109–12.[9]

---

[8]  The pseudonymous usernames of the six users who uploaded the posts at issue in this case are displayed on the posts themselves.  _See_ FAC, Exs. 1–6; U.F. 153, 160, 167, 174, 181, 188.

[9]  Brenden Delzer, an employee of LiveJournal, is one of the moderators and maintainers of the ONTD! community, and has been since before he was hired by LiveJournal in March, 2010.  U.F. 80, 101–02.  None of the posts at issue were

_(Cont'd on next page)_

It is "unnecessary" for this Court to "venture to define [the] outermost limits" of the "broad" language of Section 512(c) to determine that Plaintiff's claims of infringement against LiveJournal are "by reason of the storage" of material "at the direction of a user." *UMG Recordings I*, 620 F. Supp. 2d at 1089.  As one district court put it, "the critical statutory language really is pretty clear." *Id*.

> Common sense and widespread usage establish that 'by reason of' means 'as a result of' or 'something that can be attributed to . . . .'  So understood, when copyrighted content is displayed or distributed on [LiveJournal] it is 'as a result of' or 'attributable to' the fact that users uploaded the content to [LiveJournal] . . . .

*Id*.  Here, the six allegedly infringing user-generated posts at issue were uploaded to and stored within LiveJournal's service by LiveJournal users.  Thus, because the infringement claimed by Plaintiff occurred as a result of the actions and decisions of LiveJournal users, the safe harbor of Section 512(c) applies.

### 1.    LiveJournal Expeditiously Removes Or Disables Access To Infringing Material On Its Service In Response To DMCA Take-Down Notices

LiveJournal has established policies and procedures to receive and effectively respond to notices of claimed copyright infringement.   U.F. 48–68.[10]  Once received

---

*(Cont'd from previous page)*

approved by Mr. Delzer.  U.F. 136–47.  Aside from Mr. Delzer, no other moderator or maintainer of the ONTD! community is an employee of LiveJournal, or receives compensation from LiveJournal.  U.F. 127–28, 131.  Like countless other moderators and maintainers of the millions of communities hosted by LiveJournal, those individuals are simply ordinary users of LiveJournal's service who choose to volunteer their free time to an online community that appeals to their interests.  U.F. 127.

[10]  Section 512(c)(2) states that "[t]he limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:  (A) the name, address, phone number, and electronic mail address of the agent.  (B) other contact information which the Register of Copyrights may deem appropriate."  LiveJournal has had, at all relevant times, an agent designated to receive notices of claimed infringement as required by 17 U.S.C. § 512(c)(2) U.F. 60–61, and it makes publicly available on

*(Cont'd on next page)*

by LiveJournal, notices of claimed infringement are addressed promptly—within three days (and, in the majority of cases, within 24 hours)—by LiveJournal's Abuse Team, which disables access to the material at issue, and notifies the user who uploaded it of his or her right to submit a counter-notification under the provisions of the DMCA. U.F. 69–71.  LiveJournal, accordingly, satisfies the requirement of Section 512(c)(1)(C) (stating that, to be eligible for the safe harbor, a service provider must "upon notification of claimed infringement as described in paragraph (3), respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity").

### 2. The Undisputed Facts Establish That When LiveJournal Received Notice Of The Claimed Infringement Alleged In The FAC It Promptly Disabled Access To The Six User-Generated Posts At Issue

Under § 512(c)(1)(A), LiveJournal is entitled to safe harbor protection only where it "(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing"; "(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or" "(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material."  This requirement is clearly met here.

It is undisputed that, until the filing of this lawsuit, Plaintiff gave no notice to LiveJournal, let alone notice compliant with the DMCA, of any of the six instances of claimed infringement alleged in the FAC.  U.F. 154–94.  And, once LiveJournal became aware of the infringement alleged by Plaintiff, by reviewing the initial Complaint and the FAC filed in this lawsuit, it voluntarily responded as though it had received a "take down" notice pursuant to Section 512(c)(3) of the DMCA, and

_____

*(Cont'd from previous page)*

www.livejournal.com the requisite contact and other information concerning how and where to send such notices.  U.F. 62–64.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

Gibson, Dunn & Crutcher LLP

promptly disabled access to the six-user generated posts at issue.  U.F. 158, 165, 172, 179, 186, 193.  Accordingly, Plaintiff, "having failed to serve a notification of claimed infringement," must "meet the high burdens of demonstrating either a 'red flag' or actual knowledge" despite these uncontroverted facts.  *UMG Recordings II*, 665 F. Supp. 2d at 1107 n.11 (quoting 3-12B Nimmer on Copyright § 12B.04 n.41 (2009)); *see also Veoh*, 718 F.3d at 1020–22.  It cannot do so.

As the Ninth Circuit has made clear, "merely hosting a category of copyrightable content" with "the general knowledge that one's service could be used to share infringing material, is insufficient" to demonstrate either actual knowledge under Section 512(c)(1)(A)(i) or "red flag" knowledge—"aware[ness] of facts or circumstances from which infringing activity is apparent"—under Section 512(c)(1)(A)(ii).  *Id*. at 1022–23.  Both tests "requir[e] *specific* knowledge" of the "*particular* infringing activity" at issue.  *Id*. at 1021–22 (emphasis added).  As the Ninth Circuit recently explained in *Veoh*, "Congress made a considered policy determination that the 'DMCA notification procedures [would] place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Id*. And, in interpreting Section 512(c)(3), the Ninth Circuit has repeatedly "decline[d] to shift [that] substantial burden from the copyright owner to the provider" with respect to either actual or "red flag" knowledge.  *Id*.; *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007).[11]  Because Plaintiff can offer no evidence to create a

---

[11] This requirement "makes good sense in the context of the DMCA" because "[c]opyright holders know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers . . . , who cannot readily ascertain what material is copyrighted and what is not."  *Veoh*, 718 F.3d at 1020–22 (citing S. Rep. No. 105-190, at 48 ("[A] [service] provider could not be expected, during the course of its brief cataloguing visit, to determine whether [a] photograph was still protected by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine.")).

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

Gibson, Dunn & Crutcher LLP

triable issue of fact concerning whether LiveJournal had actual or "red flag" knowledge that any of the six user-generated posts at issue were infringing, and because LiveJournal cannot lose "safe harbor protection" for failing to investigate or to "locate and remove infringing materials [it did] not specifically know of," the requirement of Section 512(c)(1)(A) is met.  *Veoh*, 718 F.3d at 1023; *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 32–33 (2d Cir. 2012).

### 3. LiveJournal Lacks The "Right Or Ability To Control The Infringing Activity" And Does Not Receive "A Financial Benefit Directly Attributable To That Infringing Activity

An online service provider that <u>*both*</u> (1) has the right and ability to control the infringing activity <u>*and*</u> (2) receives a financial benefit directly attributable to that infringing activity falls outside the scope of Section 512(c)'s safe harbor.  17 U.S.C. § 512(c)(1)(B).  "Both elements must be met for the safe harbor to be denied." *Io Group*, 586 F. Supp. 2d at 1150.  Neither is present here.

### a. LiveJournal Lacks The "Right Or Ability To Control The Infringing Activity" Alleged By Plaintiff

With respect to the first prong, "the plain language of section 512(c) indicates that the pertinent inquiry is not whether [LiveJournal] has the right and ability to control its *system*, but rather, whether it has the right and ability to control the *infringing activity*."  *Io Group*, 586 F. Supp. 2d at 1150 (italics in original).  Indeed, Section 512(c) "*presumes*" that an eligible online service provider will have the former "sort of control" because it requires them to "remove[] or disable access to' infringing material when they become aware of it."  *Veoh*, 718 F.3d at 1029 (emphasis added); see also *UMG Recordings II*, 665 F. Supp. 2d at 1111 ("[N]umerous provisions in the DMCA make clear that the section 512(c) safe harbor applies *only* to service providers that have substantial control over users' access to material on their systems.  If that degree of control alone were enough to find that a service provider who enjoys a direct financial benefit were ineligible for the safe harbor, that would create an odd 'catch-

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

Gibson, Dunn & Crutcher LLP

22' that would substantially limit the applicability of the safe harbor.")  Thus, that a service provider has the "ability to locate infringing material" on its service and "terminate users' access" is insufficient to establish a "right and ability to control" infringing activity for purposes of Section 512(c).  *Veoh*, 718 F.3d at 1029–30.

The Ninth Circuit in *Veoh* held that "in order to have the 'right and ability to control,' the service provider 'must exert[] substantial influence on the activities of users.'"  *Id.* (citing *Viacom Int'l v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012).)  And, to date, only one court has found such "high levels of control over activities of users."  *Veoh*, 718 F.3d at 1030; *see also Viacom Int'l*, 676 F.3d at 38.  In *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002), the district court found that Cybernet—an entity that ran an "Adult Verification System" for a network of online pornographic websites[12]—had the "right and ability to control" infringing activity where it selected user websites for its network, instituted a monitoring program by which those websites received "detailed instructions regard[ing] issues of layout, appearance, and content," gave those websites extensive advice, selected certain content for those websites, "prohibited the proliferation of identical sites," and exerted its influence in a variety of other ways that demonstrated an ability to control infringing content on the websites' infringing activity.  *See id.* at 1173–74, 1181–82; *see also UMG Recordings II*, 665 F. Supp. 2d at 1114–15 (noting that Cybernet, among other things, "pre-screened sites before it allowed them to even use its age verification services").

Here, as in *Veoh*, there is simply no evidence to support the conclusion that LiveJournal exerts such control over its users, or the content of the posts they upload to its service.  *Veoh*, 718 F.3d at 1030–31; *UMG Recordings II*, 665 F. Supp. 2d at 1114–

---

[12] The district court in *Cybernet* concluded that there was a "substantial question" as to whether or not Cybernet was even a "provider of online services" within the meaning of the DMCA.  *Id.* at 1164.

15.  To the contrary, the undisputed facts establish that the content of a post uploaded to ONTD! is selected and controlled _entirely_ by the user who uploaded it.  U.F. 5–7, 44–48, 120–24, 212.  That LiveJournal—an online service provider that hosts the ONTD! community—has the ability to later remove or disable posts that have been uploaded to ONTD!, does not, as the Ninth Circuit has made clear, raise any triable issue as to LiveJournal's right and ability to control infringing activity.  _Veoh_, 718 F.3d at 1030 (evidence that the allegedly infringing material resided on defendant's system, that defendant had the ability to remove it, that defendant could have implemented, and did implement, filtering systems, and could have searched for potentially infringing content did _not_ create a triable issue of fact as to its ability to control infringing activity).

Nor does the fact that the ONTD! community is moderated—and that one of its nine moderators is an employee of LiveJournal, _supra_ note 9—give LiveJournal the requisite "high levels of control" over the activities of its users to control "the infringing activity" alleged by Plaintiff.  _Veoh_, 718 F.3d at 1030.  No moderator has the ability to edit or modify the content of a post uploaded by another user.  U.F. 113, 130.  And a moderator's decision to accept (or reject) a post is not controlled or overseen—or even reviewable—by anyone else, including anyone at LiveJournal.  U.F. 129, 132.  LiveJournal cannot be deemed to have the ability to exercise substantial control over the content of user uploads to ONTD! through individuals who—with the exception of Mr. Delzer—are _themselves_ simply other users of LiveJournal's service.  U.F. 73, 127–28.  Because the undisputed facts make clear LiveJournal lacks the right or ability to control the infringing activity alleged by Plaintiff, LiveJournal satisfies the requirement of 17 U.S.C. § 512(c)(1)(B).

### b. _LiveJournal Does Not Receive Any "Financial Benefit Directly Attributable To The Infringing Activity"_

Even if Plaintiff could create a triable issue of fact regarding LiveJournal's right and ability to control the infringing activity at issue (which it cannot), LiveJournal

Gibson, Dunn & Crutcher LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

would still satisfy Section 512(c)(1)(B) because it does not "receive a financial benefit directly attributable to the infringing activity."

In determining whether the financial benefit criterion is satisfied, courts should take "a common-sense" approach, "not a formalistic one":

> In general, a service provider conducting a legitimate business would not be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service. . . .

H.R Rep. 105-551(II), at 54.

It is undisputed that LiveJournal's basic service and all of its core features—including the ability to post, comment, and create and contribute to personal journals and communities—are free.  U.F. 10.  While users with "Paid" accounts receive access to additional features, such as a @livejournal.com forwarding e-mail address, none of those features bear any relationship to whether or not a user engages in infringing activity.  U.F. 11.  LiveJournal "charge[s] the same price to infringing and non-infringing users," and makes "money on other services it offer[s]," which are not tied—let alone directly—to the infringing activity at issue.  *Cybernet*, 213 F. Supp.2d at 1181 (citation omitted).

Nor is revenue received by LiveJournal from advertising displayed in any of the journals or communities it hosts, including ONTD!, "directly attributable" to the infringing activity alleged in the FAC.  In *Columbia Pictures Indus. v. Gary Fung*, the Ninth Circuit specified, for the first time, what constitutes a "financial benefit *directly attributable to the infringing activity*" where an online service provider derives revenue exclusively from advertising.  710 F.3d 1020, 1045 (9th Cir. 2013) (italics in original) ("*Fung*").  Although LiveJournal derives revenue from other sources, as noted above, *Fung* instructively illustrates the "confluence of circumstances" that led the Ninth Circuit to conclude that the "revenue stream" of the defendant in that case—the operator of two peer-to-peer file sharing websites who "actively induced infringing activity" on those sites—was "tied directly to the infringing activity."  *Id*.  Specifically,

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

Gibson, Dunn & Crutcher LLP

the record in *Fung* showed not only that the defendant generated revenue by selling advertising space on his websites, but that he also, among other things, "marketed" and "promoted" those sites to advertisers "by pointing to infringing activity," "attracted primarily visitors who were seeking to engage in infringing activity," and "encouraged that activity" by, among other things, "responding affirmatively to requests for help in locating and playing copyrighted materials," expressly requesting that "users upload torrents for specific copyrighted films," and "provid[ing] links to torrent files for copyrighted movies, urging users to download them." *Id*.

The undisputed facts clearly establish that LiveJournal (and the ONTD! community) are a far cry from the file sharing websites in *Fung*, and that revenue received by LiveJournal from advertising displayed in ONTD! is not "tied directly" to the six allegedly infringing posts at issue in this case, or to any infringing activity on the part of LiveJournal's users. To the contrary, the evidence makes clear that the popularity of the ONTD! community over its decade-long existence is due to the fact that it serves as a unique platform for user commentary and discussion. U.F. 81–82, 86, 215–16. User comments—and not the content of any particular post, either infringing or non-infringing—is what draws individuals to ONTD!, and is where the value of ONTD!, and all LiveJournal communities, lies. U.F. 81–84, 213–16, 219. *See CCBill*, 481 F.3d at 766–67 (stating that the relevant inquiry is 'whether the infringing activity constitutes a draw for subscribers, not just an added benefit'"). Because the record here lacks any evidence that LiveJournal—or ONTD!—attracts users or "traffic" because of the infringement alleged by Plaintiff, there can be no triable issue of fact as to whether LiveJournal "received a direct financial benefit from providing access to the infringing material." *Id*. For that reason alone, the requirement of 17 U.S.C. § 512(c)(1)(B) is satisfied.

## VI.   Conclusion

LiveJournal offers precisely the type of user-driven online service that the safe harbor of Section 512(c) was intended to protect and, indeed, encourage. Not only do

Gibson, Dunn & Crutcher LLP

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LIVEJOURNAL INC.'S MOTION FOR SUMMARY JUDGMENT**

the uncontroverted facts clearly establish LiveJournal's entitlement to the safe harbor of Section 512(c), they make clear that LiveJournal—in contrast to Plaintiff—has acted in good faith to comply with both the letter and the cooperative spirit of the DMCA.  For all of the aforementioned reasons, summary judgment should be granted in LiveJournal's favor.

DATED:  June 30, 2014

GIBSON, DUNN & CRUTCHER LLP


By:  _____/s/_____

Wayne Barsky

*Attorneys for Defendant,*
*LiveJournal, Inc.*