JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **MAVRIX PHOTOGRAPHS LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**LIVEJOURNAL, INC.,**<br><br>**Defendant.** | **Case No.: SACV 13-00517-CJC(JPRx)**<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND DENYING AS MOOT DEFENDANT'S MOTION FOR ISSUANCE OF REQUEST TO REGISTER OF COPYRIGHTS** |

## I. INTRODUCTION

This is an action for copyright infringement regarding seven sets of celebrity photographs that were posted to an online community hosted on Defendant LiveJournal, Inc.'s ("LiveJournal") web-based social media and blogging platform. Plaintiff Mavrix Photographs LLC ("Mavrix") is the assignee of the copyrights to these seven sets of photographs, which include "Popstar Katy Perry in bikini in the Bahamas taken

7/18/2010" and "Beyonce Miami blue dress baby bump 111311." (Dkt. No. 86, Supplemental First Am. Compl. ["FAC"] Exhs. 1–8.)[1] Before the Court are LiveJournal's motion for summary judgment, (Dkt. No. 62), Mavrix's cross-motion for partial summary judgment, (Dkt. No. 73), and LiveJournal's "Motion for Issuance of Request to Register of Copyrights Pursuant to 17 U.S.C. § 411(b)(2)," (Dkt. No. 70). Mavrix seeks to hold LiveJournal liable for copyright infringement on the basis of photographs third-parties uploaded to an online blogging community hosted on the LiveJournal service. LiveJournal, however, merely provides an online platform and makes the platform available to members of the public to create their own individual or communal blogs. Before this lawsuit was filed, LiveJournal did not know of the allegedly infringing posts and was not aware of "red flags" of specific infringement; it did not have the right or ability to control such infringing activity; and upon learning of the posts it promptly removed them from the site. Consequently, LiveJournal is entitled to the protection of the Digital Millennium Copyright Act ("DMCA") safe harbor codified in 17 U.S.C. § 512(c), which insulates service providers from liability for infringement based on material stored on the provider's online service at the direction of users. Accordingly, LiveJournal's motion for summary judgment is GRANTED, Mavrix's cross-motion is DENIED, and LiveJournal's "Motion for Issuance of Request to Register of Copyrights Pursuant to 17 U.S.C. § 411(b)(2)" is DENIED AS MOOT.

## II.   BACKGROUND

LiveJournal operates a web-based social media platform that allows users to create personalized online "journals." (LSUF 1–2.)[2] LiveJournal users can also create

---

[1] The original owner of the copyrights is Mavrix Photo, Inc., a celebrity photography agency, which created the Mavrix Photographs LLC entity for the purpose of bringing copyright enforcement actions. (*See* FAC ¶ 6.)

[2] "LSUF" references encompass both LiveJournal's statement of uncontroverted facts in support of its motion for summary judgment, (Dkt. No. 63), and Mavrix's response to LiveJournal's statement of uncontroverted facts, (Dkt. No. 111). Citations to "MSUF" encompass both Mavrix's statement of

"communities" around specific topics or shared interests. (LSUF 3–4.) Users can post content to their personal journals or to communities they join, and can comment on content posted by other users. (LSUF 5.) Anyone can set up a LiveJournal account and participate in the service. (LSUF 8–10.) Currently, LiveJournal hosts more than 14 million journals and more than 2.6 million communities. (LSUF 16.)

Every LiveJournal community has at least one user who acts as a "maintainer." (LSUF 27.) The maintainer has administrative privileges that allow him or her to add new maintainers, delete posts or comments, and remove or ban users from the community. (LSUF 29.) Certain communities also have chosen to be moderated communities. (LSUF 30.) Moderated communities have users who have volunteered to moderate the discussion by rejecting posts uploaded by the general users. (LSUF 109.) For example, moderators can reject posts that are spam, pornographic, harassing, or off-topic for the community. (LSUF 125.) When a user submits a post, it is automatically uploaded onto LiveJournal's servers and placed in a queue. Any moderator signed in at the time can reject the post or approve it, at which point it becomes visible to the community. (LSUF 110–15.) Moderators do not have the ability to edit or modify a post — that can only be done by the user who uploaded it. (LSUF 120–21.) Any maintainer has the ability to remove a moderator, but the decision is generally made by all maintainers and moderators as a group. (LSUF 118–19.) A moderator may be removed if, for instance, he or she is no longer actively participating in the community. (LSUF 118.)

All LiveJournal users are subject to LiveJournal's Terms of Service. (LSUF 44.) In addition, each community can institute its own guidelines and rules for posting and

---

uncontroverted facts in support of its motion for partial summary judgment, (Dkt. No. 74), and LiveJournal's statement of genuine disputes in opposition, (Dkt. No. 113). In all instances, cited facts are not substantively disputed unless otherwise indicated.

commenting in that community. (LSUF 91.) LiveJournal's Terms of Service expressly prohibit, among other things, the posting of content that infringes any copyright of a third-party. (LSUF 45–47.)[3] LiveJournal has in place a policy to terminate the accounts of users who are repeat copyright infringers, even going as far as to block their IP addresses so they cannot register a new LiveJournal account. (LSUF 50–54.) LiveJournal provides a form, contact information, and a designated agent to assist copyright owners in submitting notices of claimed copyright infringement pursuant to the DMCA. (LSUF 62–64, 71.) Upon receipt of a DMCA-compliant "take-down" notice, LiveJournal promptly disables the material claimed to be infringing, typically within 24 hours and no longer than three days pursuant to its internal policy. (LSUF 67–70.)

"Oh No They Didn't!" ("ONTD!"), http://ohnotheydidnt.livejournal.com, is a LiveJournal community geared toward discussion of celebrity gossip and pop culture with over 99,000 members worldwide. (LSUF 72, 75, 86.) On a typical weekday users create 100 to 120 new posts on the ONTD! community, as well as thousands of comments. (LSUF 76–78.) ONTD! has chosen to be a moderated community. It has nine moderators, and six of the moderators are also maintainers. (LSUF 104.) The community has also developed a set of rules. (*See* LSUF 93.)[4] In a three-and-a-half-year period between 2010 and 2014, the seven sets of photographs at issue in this action were included in posts uploaded by LiveJournal users to the ONTD! community. (*See* LSUF 136–193; FAC Exhs. 1–6, 8.) For instance, on November 15, 2011, an individual with the username "DANCE" created a post on ONTD! consisting of what appear to be four

---

[3] Mavrix's claimed dispute of these facts addresses only the rules of an individual community and does not dispute that LiveJournal's Terms of Service do in fact prohibit copyright infringement. (*See* LSUF 45–47.)

[4] These rules include, for example, "Keep it recent. We don't need a post in 2010 about Britney Spears shaving her head. However, if she does it again, by all means, post it." And "Don't be lazy. Don't be lazy with your posts. Include the article and picture(s) in your post, do not simply refer us to another site for the goods." (Dkt. No. 75, Decl. of Christopher Arledge in Supp. of Pl.'s Mot. for Partial Summ. J. ["Arledge Decl."] Exh. 5 at 2.)

candid photographs of Beyonce and her family in a public place. (*See* FAC Exh. 3.) On July 19, 2010, a user uploaded a post with nine photographs entitled "Katy Perry in a bikini," with the text: "running around the water park with her pals in a gray and red bikini with bow details. After romping around with her pals, the singer went inter-tubing on a water ride. Sure looks like fun, Katy!". (*See* FAC Exh. 1.) Mavrix made no attempt to send LiveJournal a DMCA take-down notice or otherwise notify LiveJournal of any of the seven allegedly infringing sets of photographs before filing this lawsuit. (LSUF 154, 161, 168, 175, 182, 189; Dkt. No. 116, Decl. of Mark Ferrell in Supp. of Opp'n to Pl.'s Mot. Partial Summ. J. ["Ferrell Opp'n Decl."] ¶ 3.) Upon receipt of Mavrix's Complaint and FAC in this action, LiveJournal responded as if it received a DMCA-compliant notice and disabled access to the posts containing the alleged infringement. (LSUF 158, 165, 172, 179, 186, 193; Ferrell Opp'n Decl. ¶ 3.) Two of the posters were "repeat offenders" pursuant to LiveJournal's copyright abuse policy, so LiveJournal terminated their accounts. (LSUF 194–95.)

LiveJournal has no technical means to determine which moderator approved the seven posts at issue. (LSUF 133.) One of the long-time maintainers and moderators of the ONTD! community, Brian Delzer, became an employee of LiveJournal in March 2010. (*See* LSUF 101.) To the best of his recollection, Mr. Delzer was not the moderator who approved the posts. (LSUF 136–147.)[5]

In February 2011, LiveJournal created a new class of user it calls "owner," and established a procedure to identify an "owner" for each community it hosts. (MSUF 16–17.) The "owner" has the additional administrative ability to remove maintainers from the community. (*See* MSUF 16.) The procedure to identify an owner for each community proceeded as follows: if a community had only one maintainer, he or she

[5] Mavrix asserts that this fact is disputed but does not cite any evidence in support of its assertion. (*See* LSUF 136–47.)

would become the owner.  If there were multiple maintainers, the owner title would go to the one who created the community; if that user was no longer active, it would go to the maintainer who had been active the longest.  If LiveJournal's system could not determine who the title should go to under this procedure, an election would be held and the members of the community would vote to decide the owner.  (MSUF 16–17; Arledge Decl. Exh. 14.)  Mr. Delzer was elected by the members of the ONTD! to hold the "owner" title for that community.  (MSUF 18.)  After this lawsuit was filed, LiveJournal transferred the "owner" title from Mr. Delzer to a shared account held by LiveJournal's parent company.  (MSUF 19; Arledge Decl. Exh. 201 ["Ferrell Dep."] at 86:23–87:11.)

## III. LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a).  Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law. *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for

the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex*, 477 U.S. at 325. Once this burden is met, the party resisting the motion must set forth, by affidavit or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (1) citing to materials in the record, (2) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (3) showing that the moving party lacks admissible evidence to support its factual position. Fed. R. Civ. P. 56(c)(1)(A)–(B). The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party cannot rely on the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id.*; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

//

## IV. ANALYSIS

Congress enacted Title II of the DMCA, the Online Copyright Infringement Liability Limitation Act ("OCILLA"), to address "[d]ifficult and controversial questions of copyright liability in the online world." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). In order to balance the competing interests at stake, Congress established a mechanism whereby copyright owners notify online service providers of material hosted on the provider's site the owner claims is infringing, and the service provider must remove or disable access to the material — the "notice and take down" procedure. *See* 17 U.S.C. § 512(c)(1), (3). By instituting the notice and take down procedure and giving service providers the protection afforded by a series of safe harbors, Congress endeavored to create "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2004) (quoting H.R. Rep. No. 105-551, pt. 2, at 49 (1998)).

At issue here is the 17 U.S.C. § 512(c) safe harbor for "[i]nformation residing on systems or networks at direction of users." The § 512(c) safe harbor protects service providers from liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides" on the provider's system or network, if certain requirements are met. 17 U.S.C. § 512(c)(1). These requirements are that the service provider:

> **(A)(i)** does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> **(ii)** in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

        > **(iii)** upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>
> **(B)** does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> **(C)** upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(A)–(C).[6]

Mavrix contends that LiveJournal is disqualified from the protection of the § 512(c) safe harbor on three grounds: (1) the posts at issue were not "stor[ed] at the direction of a user"; (2) LiveJournal had either actual or "red flag" knowledge of the infringing posts; and (3) LiveJournal receives a direct financial benefit from the infringing activity and has the right and ability to control the infringing activity.

**A. At the Direction of the User**

Mavrix contends that this action does not involve "infringement . . . by reason of the storage at the direction of the user of material that resides on" LiveJournal's network. According to Mavrix, the "at the direction of the user" language confines the safe harbor to situations such as where infringing material has been emailed to the editor of a newspaper and resides on the newspaper's servers, but is never made accessible to the

[6] The service provider must also have a designated agent to receive notifications of claimed infringement, 17 U.S.C. § 512(c)(2), and have adopted and reasonably implemented a policy that provides for the termination of "repeat infringers" and does not interfere with standard technical measures, 15 U.S.C. § 512(i). Mavrix does not contest these elements, nor does it contest LiveJournal's status as a "service provider" or its compliance with 17 U.S.C. § 512(c)(1)(C). (Dkt. No. 106, Pl.'s Opp'n to Def.'s Mot. Summ. J. ["Pl.'s Opp'n"] at 2 n.1.) LiveJournal has briefed these elements and the Court finds that there are no genuine disputes that LiveJournal meets these requirements for safe harbor protection.

public. (Pl.'s Opp'n at 3.) The statutory language however, is "clearly meant to cover more than mere electronic storage lockers." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1016 (9th Cir. 2013) (internal citation and quotation marks omitted). It is undisputed that third-party users selected the content for the seven posts in question, created the posts, and uploaded the posts to LiveJournal's service. That all posts had to be approved by a moderator before becoming visible on the site does not disqualify LiveJournal under the "broad" statutory language of the DMCA safe harbor for "infringement . . . by reason of the storage at the direction of the user." *See id.* at 1016–17 ("§ 512(c) presupposes that service providers will provide access to users' stored material.").[7] LiveJournal satisfies this prerequisite for § 512(c) safe harbor protection.

### B. Actual or "Red Flag" Knowledge

A service provider receives the protection of the § 512(c) safe harbor only if it "does not have actual knowledge that the material or an activity using the material on the system or network is infringing" and "is not aware of facts or circumstances from which infringing activity is apparent," or "upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A); *Shelter Capital*, 718 F.3d at 1020 & n.11. The DMCA, however, does not require

[7] The Court also rejects Mavrix's argument that the eight ONTD! moderators who are not employees of LiveJournal, but rather independent third-party users of the LiveJournal service who volunteered to participate as moderators, are nonetheless LiveJournal's "agents" for the purpose of copyright liability. The only case cited by Mavrix in which agency principles were applied to the "at the direction of the user" requirement involved individuals who were undisputedly employees of the defendant, Vimeo, and who themselves uploaded the infringing videos to the Vimeo site. *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 518 (S.D.N.Y. 2013). Not only did the employees upload the content themselves, the page displaying the videos indicated that they were posted by a Vimeo employee. The district court in *Capitol Records* addressed the question whether the "[defendant's] employees stored their videos as independent 'users' or rather on behalf of the company as [defendant's] staff," and found a triable issue of fact under the circumstances. *Id.* Here, it is undisputed that the eight moderators are not employees of LiveJournal. More important, it is undisputed that the moderators did not upload any of the seven posts at issue.

service providers to actively investigate and police possible infringement on their sites. "The DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007); *see also* 17 U.S.C. § 512(m) ("Nothing in this section shall be construed to condition the applicability of [the safe harbors] on . . . a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."). Copyright owners are "better able to efficiently identify infringing copies than service providers . . . , who cannot readily ascertain what material is copyrighted and what is not." *Shelter Capital*, 718 F.3d at 1022 (citing S. Rep. No. 105-190, at 48).[8] The Ninth Circuit has repeatedly "decline[d] to shift [that] substantial burden from the copyright owner to the provider." *Id.* (alteration in original) (quoting *CCBill*, 488 F.3d at 1113).

It is undisputed that, before filing this lawsuit, Mavrix did not provide notice to LiveJournal of any of the seven allegedly infringing posts uploaded to ONTD! between 2010 and 2014. Mavrix's "decision to forgo the DMCA notice protocol 'stripped it of the most powerful evidence of a service provider's knowledge — actual notice of infringement from the copyright holder.' " *Shelter Capital*, 718 F.3d at 1020 (quoting *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004)).

In place of the DMCA notice, Mavrix contends that LiveJournal knew the photographs were "likely somebody else's copyrighted property . . . since this type of material is frequently shot by professional paparazzi photographers and because it was

[8] The reasoning behind this is explained in the Act's legislative history: "[A] [service] provider could not be expected . . . to determine whether [a] photograph was still protected by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine." S. Rep. No. 105-190, at 48.

lifted directly from a reputable third-party source." (LSUF 155, 162, 169, 176, 183, 190.) The simple fact that a photograph is the "type of material . . . frequently shot by professional paparazzi photographers" does not rise to the level of a "red flag" sufficient to remove the § 512(c) safe harbor. *See Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1149 (N.D. Cal. 2008) (finding that the "professionally created nature of submitted content" did not constitute a "red flag" for the purpose of the § 512(c) safe harbor). The nature of the photographs at issue here, in fact, suggests just the opposite. The images are candid photographs of celebrities in public settings, unposed, mostly taken from the back or the side without the subject looking at the camera. (*See* FAC Exhs. 1–6, 8.) By all appearances, none of the celebrities consented to or even knew that their photographs were being taken.[9] Even if service providers were required to conduct the type of extensive infringement investigation and analysis Mavrix suggests, it would be nearly impossible for a provider to distinguish between "professional paparazzi" photographs, which Mavrix contends would be objectively obvious infringing content, and photographs taken by any member of the public with a digital camera or smartphone. *See Shelter Capital*, 718 F.3d at 1021 ("[M]erely hosting material that falls within a category of content capable of copyright protection, with the general knowledge that one's services could be used to share unauthorized copies of copyrighted material" is not sufficient to impute knowledge to service providers.). Even taking the facts in the light most favorable to Mavrix, LiveJournal had neither actual nor "red flag" knowledge of specific infringement. *Cf. Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020, 1036, 1043 (9th Cir. 2013) (finding red flag knowledge where the material at issue included the 20 top-grossing movies then playing in U.S. theaters and was "sufficiently current and well-known that it would have been objectively obvious to a reasonable

[9] The set of photographs entitled "Katy Perry's colorful rooftop photoshoot" do not appear to be the photographs taken during the photo shoot itself. Rather, they appear to be photographs of the photo shoot taking place, perhaps without the authorization of the professional photographer. (*See* FAC Exh. 2.)

person that [it] . . . was both copyrighted and not licensed to random members of the public, and . . . therefore infringing”).[10]

**C. “Direct Financial Benefit” and “Right and Ability to Control”**

A service provider is not eligible for the § 512(c) safe harbor if it both “receive[s] a financial benefit directly attributable to the infringing activity” and “has the right and ability to control such activity.” 17 U.S.C. § 512(c)(1)(B). In order to meet the “right and ability to control” requirement, it must be shown that the service provider “exert[s] substantial influence on the activities of users.” *Shelter Capital*, 718 F.3d at 1030 (quoting *Viacom Int’l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012)). “Substantial influence” may be shown by intentional acts constituting inducement of copyright infringement under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005), or “high levels of control over activities of users,” as displayed by the service provider in *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1163 (C.D. Cal. 2002). *Shelter Capital*, 718 F.3d at 1030. Inducement of copyright infringement under *Grokster* occurs where the defendant “distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement.” *Grokster*, 545 U.S. at 936–37. In *Cybernet*, the district court found “high levels of control” because the defendant directed a group of websites as a “unified brand” by dictating “detailed instructions regard[ing] issues of layout, appearance, and content,” paid commissions to those websites, and employed a staff of twelve to monitor and spot check the sites’ compliance. 213 F. Supp. 2d at 1164, 1170, 1173. The court found the defendant’s “entire business model [] premised on harnessing the competitive pressures between individual webmasters into a

---

10 Nor does any evidence before the Court indicate that LiveJournal “willfully bur[ies] its head in the sand to avoid obtaining . . . specific knowledge” of copyright infringement. *See Shelter Capital*, 718 F.3d at 1023. The undisputed facts show that LiveJournal promptly removes infringing content when it becomes aware of specific instances of infringement. *See id.*

cooperative system." *Id.* at 1170.  On the other hand, it is well settled that having the ability to remove or block access to material, locate infringing material, or terminate users' access does not constitute "control" sufficient to remove a service provider's safe harbor protection.  *Shelter Capital*, 718 F.3d at 1027.  The DMCA in fact requires these very acts to qualify for the safe harbor.  *Id.*  "[T]he pertinent inquiry is not whether [the service provider] has the right and ability to control its system, but rather, whether it has the right and ability to control the infringing activity."  *Io Group*, 586 F. Supp. 2d at 1151.

   The evidence before the Court shows neither high levels of control by LiveJournal nor LiveJournal inducing its users to commit copyright infringement.  The undisputed facts show that users of the LiveJournal service, not LiveJournal, select the content to be posted, put that content together into a post, and upload the post to LiveJournal's service.  LiveJournal does not solicit any specific infringing material from its users or edit the content of its users' posts.  Nor does it have the ability to do so.  Mavrix contends that LiveJournal exerts control through its employee, Mr. Delzer.  Mr. Delzer, however, is merely one of six maintainers with the same administrative privileges for ONTD!, and merely one of eight ONTD! users with moderator powers.  Nevertheless, Mavrix asserts that Mr. Delzer can exert control over the other maintainers and moderators, who then presumably control the activities of users.  For example, Mavrix contends that "Delzer has criticized moderators and maintainers of ONTD! for accepting submissions that are not properly sourced and has ordered them not to repeat that mistake in the future." (MSUF 30.)  The evidence Mavrix submits to support this purported fact, however, is a post by Mr. Delzer to the internal ONTD! moderators/maintainers page that reads as follows:

> just an fyi, someone approved a post from [a user] that was completely made up — as in . . . none of the text was at the source.  please be a little more observant :)

(Dkt. No. 100, Exh. 203 to Arledge Decl., at LJ009062.)[11]  This hardly shows the level of control that could exert "substantial influence" over the activities of LiveJournal's users.[12]

Mavrix also contends that two of the rules put in place by the ONTD! community "virtually guarantee that every piece of content on ONTD! infringes somebody's copyright."  (Dkt. No. 73, Pl.'s Mot. Partial Summ. J. ["Pl.'s MSJ"] at 5.)  The first rule states, according to Mavrix, that ONTD! "will accept only full reproductions of other people's articles."  (Pl.'s MSJ at 5.)  The second rule, again according to Mavrix, requires posters to take content from "reputable third-party sources."  (Pl.'s MSJ at 7.)  Mavrix reasons that material from "reputable third-party sources" will likely be subject to copyright, and copying an entire article will likely constitute copyright infringement, thus "LiveJournal essentially demands that its members steal the content from third parties."  (Pl.'s MSJ at 5.)  As an initial matter, the text of the first rule does not say that ONTD! "will accept only full reproductions of other people's articles."  The rule states: "Don't be lazy with your posts.  Include the article and picture(s) in your post, do not simply refer us to another site for the goods."  (Arledge Decl. Exh. 5, at 2.)  The only evidence before the Court explaining this rule is the deposition of Mr. Delzer, in which he explained, "My understanding [of the rule] is don't just put a URL.  You have to have

---

[11]  Nor does the second post by Mr. Delzer Mavrix submits show such control.  It reads as follows:

> please reject any posts sourced from the site 'whatculture.com' — mostly it's just dumb lists anyway. they keep emailing about deleting posts — i'll add them to the user info, please dont' (sic) accept any more posts from this site! thank you :)

(Exh. 203 to Arledge Decl. at LJ009020.)

[12]  Mavrix's initial FAC alleged infringement of six sets of photographs.  On July 8, 2014, the Court granted Mavrix's request to file a Supplemental FAC adding one set of photographs allegedly uploaded to ONTD! in February 2014.  (Dkt. No. 85.)  Mavrix has not provided any material reason to treat this additional set of photographs differently for the purposes of the DMCA safe harbor.  Although the two photographs in the new set included the text "mavrixonline.com" on their bottom margin, Mr. Delzer, the only moderator who is an employee of LiveJournal, was unaware that Mavrix had a website, (Dkt. No. 114, Exh. 2 [Delzer Dep.] at 228:5–14), and the remaining moderators are independent third-party users, not agents of LiveJournal.

a conversation starter. You have to have a starting off point for the post for people to comment on." (Arledge Decl. Exh. 200 [Delzer Dep.], at 141:13–19.) The second rule simply says: "You must provide a source. Include a FULL AND DIRECT URL (i.e. "permalink") to your source." (Arledge Decl. Exh. 5, at 2.) The existence of these two rules is a far cry from the type of intentional inducement that has been found to disqualify a service provider under the "right and ability to control" element. For instance, in *Fung*, the record was "replete with instances of Fung responding personally to queries for assistance in: uploading torrent files corresponding to obviously copyrighted material, finding particular copyrighted movies and television shows, getting pirated material to play properly, and burning the infringing content onto DVDs for playback on televisions." 710 F.3d at 1036. Nor do these rules, or any other evidence before the Court, suggest that LiveJournal has the "high levels of control" found in *Cybernet*. Neither LiveJournal nor Mr. Delzer dictates "detailed instructions regard[ing] issues of layout, appearance, and content" to users, they do not pay commissions to users for their posts, and in no way is LiveJournal's "entire business model [] premised on harnessing the competitive pressures between individual webmasters into a cooperative system." *See Cybernet*, 213 F. Supp. 2d at 1170.

**D. Injunctive Relief**

The § 512(c) safe harbor insulates a service provider from all monetary relief. It also bars most equitable relief, apart from certain specified injunctions. *See* 17 U.S.C. § 512(c)(1), (j). The undisputed facts, however, show that Mavrix is not entitled to any of the narrow forms of injunctive relief permitted under the statute. It is undisputed that LiveJournal has already disabled access to the infringing posts and has terminated the two users who qualified as repeat offenders under its policy. Accordingly, the injunctive relief available under § 512(j)(1)(i) and (ii) would be moot. Mavrix asserts that it may be eligible for relief under subsection (iii), which allows "[s]uch other relief as the court

may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose." 17 U.S.C. § 512(j)(1)(iii). The undisputed facts show that the only technical measure in LiveJournal's service that could be used to prevent users from uploading Mavrix's photographs in the future is its "anti-spam" system, which can block users from uploading posts with specific keywords. (Ferrell Dep. at 196:6–19.) It is also undisputed that LiveJournal has already employed this measure to block posts with the keyword "mavrixonline.com." (Ferrell Opp'n Decl. ¶ 2.) Mavrix has not shown that any other relief is necessary, or that such relief would be "the least burdensome to the service provider among the forms of relief comparably effective for that purpose." No triable issue of fact exists as to injunctive relief.

**E. Request to Register of Copyrights**

LiveJournal has moved the Court to issue a request to the Register of Copyrights under 17 U.S.C. § 411(b)(2). Section 411(b)(2) provides that, before a district court can invalidate a registration on the basis of material misrepresentations in the application, it must first obtain input from the Register of Copyrights as to whether the information would have caused it to refuse registration. 17 U.S.C. § 411(b)(2). The court can, however, "demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality." *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013). LiveJournal has not established the other preconditions to invalidity. In any event, given the Court's grant of summary judgment in LiveJournal's favor, its Motion for Issuance of Request to Register of Copyrights Pursuant to 17 U.S.C. § 411(b)(2) is DENIED AS MOOT.

## V. CONCLUSION

LiveJournal is simply the operator of an online platform on which anyone can create his or her own individual blog or start a group blog based on shared interests. LiveJournal is entitled to the § 512(c) safe harbor for the seven allegedly infringing posts users of its service composed and uploaded to the ONTD! site. Accordingly, LiveJournal's motion for summary judgment is GRANTED and Mavrix's cross-motion for partial summary judgment is DENIED.

DATED: September 19, 2014

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE