**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAVRIX PHOTOGRAPHS, LLC, a California limited liability company, *Plaintiff-Appellant*, <br><br> v. <br><br> LIVEJOURNAL, INC., *Defendant-Appellee.* | No. 14-56596 <br><br> D.C. No. 8:13-cv-00517-CJC-JPR <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued Submitted October 7, 2016
Pasadena, California

Filed April 7, 2017

Before: Harry Pregerson, Richard A. Paez,
and Morgan Christen, Circuit Judges.

Opinion by Judge Paez

## SUMMARY[*]

### Digital Millennium Copyright Act

The panel (1) reversed the district court's holding, on summary judgment, that the defendant was protected by the safe harbor of the Digital Millennium Copyright Act from liability for posting the plaintiff's photographs online and (2) vacated a discovery order.

The panel held that the safe harbor set forth in 17 U.S.C. § 512(c) would apply if the photographs were posted at the direction of users. The defendant, a social media platform, posted the photographs after a team of volunteer moderators, led by an employee of the defendant, reviewed and approved them. The panel held that whether the photographs were posted at the direction of users depended on whether the acts of the moderators could be attributed to the defendant. Disagreeing with the district court, the panel held that the common law of agency applied to the defendant's safe harbor defense. Because there were genuine factual disputes regarding whether the moderators were the defendant's agents, the panel reversed the district court's summary judgment and remanded the case for trial.

The panel also discussed the remaining elements of the safe harbor affirmative defense. If an internet service provider shows that the infringing material was posted "at the direction of the user," it must then also show that (1) it lacked actual or red flag knowledge of the infringing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

material; and (2) it did not financially benefit from infringements that it had the right and ability to control. The panel held that to fully assess actual knowledge, the fact finder must consider not only whether the copyright holder has given notice of the infringement, but also the service provider's subjective knowledge of the infringing nature of the posts. The panel held that to determine whether the defendant had red flag knowledge, the fact finder would need to assess whether it would be objectively obvious to a reasonable person that material bearing a generic watermark or a watermark referring to the plaintiff's website was infringing. When assessing the service provider's right and ability to control the infringements, the fact finder should consider the service provider's procedures that existed at the time of the infringements and whether the service provider had "something more" than the ability to remove or block access to posted materials.

Finally, the panel vacated the district court's order denying discovery of the moderators' identities.

## COUNSEL

Peter Afrasiabi (argued), Christopher W. Arledge, and John Tehranian, One LLP, Newport Beach, California, for Plaintiff-Appellant.

Wayne Mitchell Barsky (argued), Blaine H. Evanson, and Brandon J. Stoker, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendant-Appellee.

## OPINION

PAEZ, Circuit Judge:

Plaintiff Mavrix Photographs ("Mavrix") appeals the district court's summary judgment in favor of Defendant LiveJournal. Mavrix sued LiveJournal for posting twenty of its copyrighted photographs online. The district court held that the Digital Millennium Copyright Act's ("DMCA") § 512(c) safe harbor protected LiveJournal from liability because Mavrix's photographs were posted at the direction of the user. 17 U.S.C. § 512(c).

To be eligible at the threshold for the § 512(c) safe harbor, LiveJournal must show that the photographs were posted at the direction of the user. Although users submitted Mavrix's photographs to LiveJournal, LiveJournal posted the photographs after a team of volunteer moderators led by a LiveJournal employee reviewed and approved them. Whether these photographs were truly "posted at the direction of the user," or instead whether LiveJournal itself posted the photographs, depends on whether the acts of the moderators can be attributed to LiveJournal. The issue we must decide is whether the common law of agency applies to LiveJournal's safe harbor defense. The district court ruled that the common law of agency does not apply to this analysis. We disagree and conclude that it does. As there are genuine factual disputes regarding whether the moderators are LiveJournal's agents, we reverse the district court's summary judgment and remand for trial.

Because the district court ruled on the remaining elements of the safe harbor, we also proceed to discuss those elements in order to provide guidance to the district court and parties

on remand.  Finally, we vacate the district court's order denying discovery of the moderators' identities because the agency determination may affect this analysis.

## I.

*LiveJournal*[1]

LiveJournal is a social media platform.  Among other services, it allows users to create and run thematic "communities" in which they post and comment on content related to the theme.  LiveJournal communities can create their own rules for submitting and commenting on posts.

LiveJournal set up three types of unpaid administrator roles to run its communities.  "Moderators" review posts submitted by users to ensure compliance with the rules.[2] "Maintainers" review and delete posts and have the authority to remove moderators and users from the community.  Each community also has one "owner"  who has the authority of a maintainer, but can also remove maintainers.

LiveJournal protects against copyright infringement in its communities through various mechanisms.  LiveJournal follows the formal notice and takedown procedures outlined in the DMCA by designating an agent and form to report infringement, and by promptly removing infringing posts and prohibiting repeat abusers from the community.  17 U.S.C.

---

[1] The facts are undisputed unless otherwise noted.

[2] Because moderators, maintainers, and owners all can review posts, we refer to all three as moderators when discussing the act of reviewing posts.

§ 512(c)(1)(C).  LiveJournal's Terms of Service instructs users not to "[u]pload, post or otherwise transmit any Content that infringes any patent, trademark, trade secret, copyright or other proprietary rights."

*Oh No They Didn't! ("ONTD")*

ONTD is a popular LiveJournal community which features up-to-date celebrity news.  Users submit posts containing photographs, videos, links, and gossip about celebrities' lives.  ONTD moderators review and publicly post some of the submissions.  Other users engage in conversations about the celebrity news in the comments section of each post.  For example, one of the ONTD posts at issue contained photographs that Mavrix had taken which appeared to show that super-celebrity Beyoncé was pregnant.  Users speculated in the comments section of that post that Beyoncé was indeed pregnant.[3]

Like other LiveJournal communities, ONTD created rules for submitting and commenting on posts.  ONTD's rules pertain to both potential copyright infringement and substantive guidance for users.  For example, one rule instructs users to "[i]nclude the article and picture(s) in your post, do not simply refer us off to another site for the goods."  Another rule provides "Keep it recent. We don't need a post in 2010 about Britney Spears shaving her head."  ONTD's

---

[3] In a more recent post about Beyoncé, a user speculated that she would perform her song "Formation" at the 2016 Super Bowl.  Other users commented on the post, debating how Beyoncé might incorporate feminist and racial justice themes into her performance. XOXOBLISS, *Beyoncé Is Performing Formation at the Super Bowl + Celebrities React to Formation*, ONTD (Feb. 6, 2016, 05:49 PM), http://ohnotheydidnt.livejournal.com/100179096.html.

rules also include a list of sources from which users should not copy material.  The sources on the list have informally requested that ONTD stop posting infringing material. ONTD has also automatically blocked all material from one source that sent ONTD a cease and desist letter.

ONTD has nine moderators, six maintainers, and one owner.   ONTD users submit proposed posts containing celebrity news to an internal queue.  Moderators review the submissions and publicly post approximately one-third of them. Moderators review for substance, approving only those submissions relevant to new and exciting celebrity news. Moderators also review for copyright infringement, pornography, and harassment.

When ONTD was created, like other LiveJournal communities, it was operated exclusively by volunteer moderators.  LiveJournal was not involved in the day-to-day operation of the site.  ONTD, however, grew in popularity to 52 million page views per month in 2010 and attracted LiveJournal's attention.  By a significant margin, ONTD is LiveJournal's most popular community and is the only community with a "household name."  In 2010, LiveJournal sought to exercise more control over ONTD so that it could generate advertising revenue from the popular community. LiveJournal hired a then active moderator, Brendan Delzer, to serve as the community's full time "primary leader."  By hiring Delzer, LiveJournal intended to "take over" ONTD, grow the site, and run ads on it.[4]

---

[4] When Delzer was hired in 2010, LiveJournal had not yet created the owner administrator position.  In 2011, when LiveJournal created the owner position, Delzer was elected by the community and became the

As the "primary leader," Delzer instructs ONTD moderators on the content they should approve and selects and removes moderators on the basis of their performance. Delzer also continues to perform moderator work, reviewing and approving posts alongside the other moderators whom he oversees. While Delzer is paid and expected to work full time, the other moderators are "free to leave and go and volunteer their time in any way they see fit." In his deposition, Mark Ferrell, the General Manager of LiveJournal's U.S. office, explained that Delzer "acts in some capacities as a sort of head maintainer" and serves in an "elevated status" to the other moderators. Delzer, on the other hand, testified at his deposition that he does not serve as head moderator and that ONTD has no "primary leader."

*Mavrix*

Mavrix is a celebrity photography company specializing in candid photographs of celebrities in tropical locations. The company sells its photographs to celebrity magazines. According to Mavrix, infringement of its photographs is particularly devastating to its business model. Since Mavrix's photographs break celebrity news, such as the pregnancy of Beyoncé, infringing posts on sites like ONTD prevent Mavrix from profiting from the sale of the photographs to celebrity magazines.

*Procedural History*

Mavrix filed an action for damages and injunctive relief against LiveJournal alleging copyright infringement on the

owner. After this lawsuit was filed, LiveJournal's parent company became the owner.

basis of twenty Mavrix photographs posted on ONTD. ONTD posted the photographs in seven separate posts between 2010 and 2014.   Some of these photographs contained either a generic watermark or a specific watermark featuring Mavrix's website "Mavrixonline.com."  To the best of his recollection, Delzer did not personally approve the seven posts.   LiveJournal has no technological means of determining which moderator approved any given post. Mavrix did not utilize LiveJournal's notice and takedown procedure to notify LiveJournal of the infringements.  When Mavrix filed this lawsuit, LiveJournal removed the posts.[5]

During discovery, Mavrix filed two motions to compel responses to its interrogatories seeking the identity of the ONTD moderators.   The magistrate judge denied the first motion, finding that Mavrix had not met and conferred with LiveJournal in good faith.  The magistrate judge denied the second motion to compel because Mavrix failed to notify the anonymous parties of the pending motion.  Mavrix moved the district court for review of the magistrate judge's order, which the district court denied on the basis of the moderators' First Amendment right to anonymous internet speech.

LiveJournal moved for summary judgment on the basis of the § 512(c) safe harbor.   The district court granted LiveJournal's motion and denied Mavrix's cross-motion for partial summary judgment, concluding that the § 512(c) safe harbor shielded LiveJournal from liability for copyright infringement.  Mavrix timely appealed.

---

[5] Because LiveJournal removed the posts, Mavrix's request for injunctive relief is likely moot.

## II.

We review de novo a district court's grant of summary judgment. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014) (citing *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 954 (9th Cir.2013)). We must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.*

The district court's denial of a motion to reconsider a magistrate judge's pretrial discovery order under Federal Rule of Civil Procedure 72(a) will be reversed only if "clearly erroneous or contrary to law." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004) (citing *Osband v. Woodford*, 290 F.3d 1036, 1041 (9th Cir.2002)).

## III.

### A.

The DMCA strikes a balance between the interests of "copyright holders in benefitting from their labor; . . . entrepreneurs in having the latitude to invent new technologies without fear of being held liable if their innovations are used by others in unintended infringing ways; and those of the public in having access [to] both . . . ." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1037 (9th Cir. 2013). The DMCA balances these interests by requiring service providers to take down infringing materials when copyright holders notify them of the infringement and by limiting service providers' liability for unintentional

infringement through several safe harbors.  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

The DMCA established four safe harbors to "provide protection from liability for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools."  *Id.* at 1076–77 (citing 17 U.S.C. § 512(a)–(d)).  LiveJournal claimed protection from damages under the § 512(c) safe harbor for "infringement of copyright by reason of the storage [of material] at the direction of a user."  17 U.S.C. § 512(c)(1).  To be eligible at the threshold for the § 512(c) safe harbor, a service provider must show that the infringing material was posted "at the direction of the user."  17 U.S.C. § 512(c)(1).[6]

---

[6] Section 512(c)(1) provides in relevant part:

A service provider shall not be liable . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider–

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

If it meets that threshold requirement, the service provider must then show that (1) it lacked actual or red flag knowledge of the infringing material; and (2) it did not receive a "financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." *Id.*[7]  Because the § 512(c) safe harbor is an affirmative defense, LiveJournal must establish "beyond controversy every essential element," and failure to do so will render LiveJournal ineligible for the § 512(c) safe harbor's protection.  *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003); *see also UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1013 (9th Cir. 2013).

## B.

### 1.

LiveJournal must make a threshold showing that Mavrix's photographs were posted on ONTD at the direction of the user.  The district court held that although moderators

---

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement . . . , responds expeditiously to remove, or disable access to, the material that is claimed to be infringing . . . .

17 U.S.C. § 512(c)(1).

[7] LiveJournal must also show that it complied with § 512(c)'s notice and takedown procedure, but that issue is not contested in this case.

screened and publicly posted all of the ONTD posts, the posts
were at the direction of the user.  The district court focused
on the users' submission of infringing photographs to
LiveJournal rather than LiveJournal's screening and public
posting of the photographs.  A different safe harbor, § 512(a),
protects service providers from liability for the passive role
they play when users submit infringing material to them.
17 U.S.C. § 512(a); *see, e.g.*, *Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102, 1116 (9th Cir. 2007) (describing infringing
material passively and temporarily placed on a computer
server as within the § 512(a) safe harbor).  The § 512(c) safe
harbor, however, focuses on the service provider's role in
publicly posting infringing material on its site.  *See Shelter
Capital*, 718 F.3d at 1018; S. Rep. No. 105-190, at 43–44
(1998).  Contrary to the district court's view, posting rather
than submission is the critical inquiry.  *See Perfect 10, Inc. v.
Giganews, Inc.*, 847 F.3d 657, 668–69 (9th Cir. 2017)
(distinguishing between the service provider's passive role
when users "upload[] infringing content onto [] servers" and
"any sort of active role" on the basis of who "caused the
images to be displayed").  In the context of this case, that
inquiry turns on the role of the moderators in screening and
posting users' submissions and whether their acts may be
attributed to LiveJournal.

**2.**

Mavrix, relying on the common law of agency, argues
that the moderators are LiveJournal's agents, making
LiveJournal liable for the moderators' acts.  The district court
erred in rejecting this argument.

"[S]tatutes are presumed not to disturb the common law,
'unless the language of a statute [is] clear and explicit for this

purpose.'"  *State Eng'r of Nev. v. S. Fork Band of Te-Moak
Tribe of W. Shoshone Indians of Nev.*, 339 F.3d 804, 814 (9th
Cir. 2003) (quoting *Norfolk Redevelopment & Hous. Auth. v.
Chesapeake & Potomac Tel. Co. of Va.*, 464 U.S. 30, 35
(1983)).  Pursuant to this principle, the Supreme Court and
this court have applied common law in cases involving
federal copyright law, including the DMCA.  The Supreme
Court has applied the common law of agency in interpreting
the Copyright Act.  *Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730, 751–52 (1989).  We have applied the common
law of vicarious liability in analyzing the DMCA, reasoning
that Congress intended that the DMCA's "limitations of
liability" be interpreted "under existing principles of law."
*Ellison*, 357 F.3d at 1076–77 (quoting S. Rep. 105-190, at 19
(1998)).  We have also applied the common law of agency to
determine a service provider's intent to infringe under the
DMCA.  *Fung*, 710 F.3d at 1038.

Along with other courts, we have applied agency law to
questions much like the question of LiveJournal's liability for
the moderators' acts.  We applied agency law to determine
whether a service provider was responsible under the DMCA
for copyright infringement by its employees.  *Fung*, 710 F.3d
at 1038.  The Tenth Circuit applied agency law to determine
whether a service provider was responsible under the DMCA
for copyright infringement by its contractors.  *See BWP
Media USA, Inc. v. Clarity Dig. Grp., LLC*, 820 F.3d 1175,
1180 (10th Cir. 2016).[8]  Finally, a district court applied

---

[8] The Tenth Circuit held that the service provider's contractors were
"users" rather than agents under the DMCA. *BWP*, 820 F.3d at 1180.  The
court also held that even if the contractors were agents, they were not
employees. *Id.* at 1181.  Finally, the court held that even if the contractors
were employees, they could still be users. *Id.*  To the extent that *BWP*'s

agency law to determine whether a service provider was responsible under the DMCA for the acts of moderators. *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW(JCx), 2009 WL 6355911, at *13 n.21 (C.D. Cal. Dec. 21, 2009), *aff'd in part*, 710 F.3d 1020 (9th Cir. 2013).[9]  We therefore have little difficulty holding that common law agency principles apply to the analysis of whether a service provider like LiveJournal is liable for the acts of the ONTD moderators.

**3.**

In light of the summary judgment record, we conclude that there are genuine issues of material fact as to whether the moderators are LiveJournal's agents.  The factual dispute is evident when we apply common law agency principles to the evidentiary record.

___

holding contradicts our case law that common law principles of agency apply to the DMCA such that a service provider is liable for the acts of its agents, including its employees, we reject it.  *See, e.g.*, *Fung*, 710 F.3d at 1038 ("When dealing with corporate or entity defendants, . . . the relevant intent must be that of the entity itself, as defined by traditional agency law principles . . . .").

[9] Although the district court's order does not specify whether the moderators were paid, the parties' filings before the district court make clear that the moderators were unpaid.  *See* Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment on Liability at 2, Columbia Pictures Indus., Inc. v. Fung, No. CV 06-5578 SVW(JCx) (C.D. Cal. Dec. 21, 2009), 2009 WL 6355911; Plaintiff's Reply Statement of Uncontroverted Facts in Support of Plaintiff's Motion for Summary Judgment on Liability at 6, Columbia Pictures Indus., Inc. v. Fung, No. CV 06-5578 SVW(JCx) (C.D. Cal. Dec. 21, 2009), 2009 WL 6355911.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Of Agency § 1.01 (Am. Law Inst. 2006). For an agency relationship to exist, an agent must have authority to act on behalf of the principal and "[t]he person represented [must have] a right to control the actions of the agent." Restatement (Third) Of Agency § 1.01, cmt. c (Am. Law Inst. 2006).

An agency relationship may be created through actual or apparent authority. *Gomez v. Campbell-Ewald Co*., 768 F.3d 871, 878 (9th Cir. 2014) (citing Restatement (Third) of Agency §§ 2.01, 2.03, 4.01 (Am. Law Inst. 2006)), *cert. granted*, 135 S. Ct. 2311, (2015), *and aff'd*, 136 S. Ct. 663 (2016). Actual authority arises through "the principal's assent that the agent take action on the principal's behalf." Restatement (Third) of Agency § 3.01 (Am. Law Inst. 2006). LiveJournal argues that it did not assent to the moderators acting on its behalf. Mavrix, however, presented evidence that LiveJournal gave its moderators explicit and varying levels of authority to screen posts. Although LiveJournal calls the moderators "volunteers," the moderators performed a vital function in LiveJournal's business model.[10] There is evidence in the record that LiveJournal gave moderators express directions about their screening functions, including criteria for accepting or rejecting posts. Unlike other sites

---

[10] Agents need not receive payment from their principal to be agents. Restatement (Third) of Agency § 1.01 cmt. d (Am. Law Inst. 2006) ("Many agents act or promise to act gratuitously."); Model Civ. Jury Instr. 9th Cir. 4.4 (2007) ("One may be an agent without receiving compensation for services.").

where users may independently post content, LiveJournal relies on moderators as an integral part of its screening and posting business model.  LiveJournal also provides three different levels of authority: moderators review posts to ensure they contain celebrity gossip and not pornography or harassment, maintainers delete posts and can remove moderators, and owners can remove maintainers.  Genuine issues of material fact therefore exist regarding whether the moderators had actual authority.

Apparent authority arises by "a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation."  Restatement (Third) of Agency § 3.03 (Am. Law Inst. 2006); *see also Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 756 (9th Cir. 1969).  "The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts . . . under circumstances which create in him a reputation of authority. . . ."  *Hawaiian Paradise Park*, 414 F.2d at 756.

LiveJournal selected moderators and provided them with specific directions.  Mavrix presented evidence that LiveJournal users may have reasonably believed that the moderators had authority to act for LiveJournal.  One user whose post was removed pursuant to a DMCA notice complained to LiveJournal "I'm sure my entry does not violate any sort of copyright law. . . . I followed [ONTD's] formatting standards and the moderators checked and approved my post."  The user relied on the moderators'

approval as a manifestation that the post complied with copyright law, and the user appeared to believe the moderators acted on behalf of LiveJournal.  Such reliance is likely traceable to LiveJournal's policy of providing explicit roles and authority to the moderators.  Accordingly, genuine issues of material fact exist regarding whether there was an apparent authority relationship.

Whether an agency relationship exists also depends on the level of control a principal exerts over the agent.  *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2657–58 (2013) (referring to control as one of "the basic features of an agency relationship"); *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010) (explaining that the "the extent of control exercised by the employer" is the "essential ingredient" in determining an agency relationship) (quoting *NLRB v. Friendly Cab Co.*, 512 F.3d 1090, 1096 (9th Cir. 2008).  Evidence presented by Mavrix shows that LiveJournal maintains significant control over ONTD and its moderators.  Delzer gives the moderators substantive supervision and selects and removes moderators on the basis of their performance, thus demonstrating control.  Delzer also exercises control over the moderators' work schedule.  For example, he added a moderator from Europe so that there would be a moderator who could work while other moderators slept.  Further demonstrating LiveJournal's control over the moderators, the moderators' screening criteria derive from rules ratified by LiveJournal.[11]

---

[11] LiveJournal ratified the ONTD rules when Ferrell discussed changing the rules with Delzer and declined to do so.  *See United States v. Alaska S.S. Co.*, 491 F.2d 1147, 1155 (9th Cir.1974) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. . . .") (quoting Restatement

On the other hand, ONTD moderators "are free to leave and go and volunteer their time in any way they see fit."  In addition, the moderators can reject submissions for reasons other than those provided by the rules, which calls into question the level of control that LiveJournal exerts over their conduct.  This evidence raises genuine issues of material fact regarding the level of control LiveJournal exercised over the moderators.  From the evidence currently in the record, reasonable jurors could conclude that an agency relationship existed.

**4.**

We turn briefly to a related issue that the fact finder must resolve in the event there is a finding that the moderators are agents of LiveJournal.  In that event, the fact finder must assess whether Mavrix's photographs were indeed posted at the direction of the users in light of the moderators' role in screening and posting the photographs.  Posts are at the direction of the user if the service provider played no role in posting them on its site or if the service provider carried out activities that were "narrowly directed" towards enhancing the accessibility of the posts.  *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1092 (C.D. Cal. 2008); *see also Shelter Capital*, 718 F.3d at 1018. Accessibility-enhancing activities include automatic processes, for example, to reformat posts or perform some technological change.  *Shelter Capital*, 718 F.3d at 1020 (referring to accessibility-enhancing activities as those where the service provider did "not actively participate in or supervise file uploading").  Some manual service provider

---

(Second) of Agency § 82 (Am. Law Inst. 1958)); *see also Gomez*, 768 F.3d at 878.

activities that screen for infringement or other harmful material like pornography can also be accessibility-enhancing. *Id.* at 1012 n.2. Indeed, § 512(m) of the DMCA provides that no liability will arise from "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." *Id.* at 1022 (quoting 17 U.S.C. § 512(m)).[12]

The ONTD moderators manually review submissions and publicly post only about one-third of submissions. The moderators review the substance of posts; only those posts relevant to new and exciting celebrity gossip are approved. The question for the fact finder is whether the moderators' acts were merely accessibility-enhancing activities or whether instead their extensive, manual, and substantive activities

---

[12] The district court did not assess whether the moderators' review of posts exceeded accessibility-enhancing activities because it focused on submission rather than posting and did not determine whether the moderators were agents. In *Shelter Capital*, we suggested that accessibility-enhancing activities have a limit when we approved software "processes that automatically occur when a user uploads" materials as within accessibility-enhancing activities. 718 F.3d at 1016, 1020. Other circuits have more squarely faced the outer edges of this limit. The Second Circuit found it a close call and remanded when YouTube manually selected videos for front page syndication on the basis of substance. *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 40 (2d Cir. 2012). The district court on remand held that only those processes "without manual intervention" satisfied the § 512(c) safe harbor. *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 123 (S.D.N.Y. 2013). The Fourth Circuit extended accessibility-enhancing activities to include a real estate website's "cursory" manual screening to determine whether photographs indeed depicted real estate. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 556 (4th Cir. 2004). The fact finder should determine whether LiveJournal's manual, substantive review process went beyond the automatic processes we have approved as accessibility-enhancing activities such that the posts were still at the direction of the user.

went beyond the automatic and limited manual activities we
have approved as accessibility-enhancing.

\* \* \*

Because the district court focused on the users'
submission of Mavrix's photographs rather than on ONTD's
posting of those photographs and rejected Mavrix's argument
that unpaid moderators could be agents of LiveJournal, the
district court erred in granting summary judgment to
LiveJournal.  Genuine issues of material fact exist as to
whether the moderators were LiveJournal's agents.
Accordingly, remand is warranted.  In assessing
LiveJournal's threshold eligibility for the § 512(c) safe
harbor, the fact finder must resolve the factual dispute
regarding the moderators' status as LiveJournal's agents and
in light of that determination, whether LiveJournal showed
that Mavrix's photographs were posted at the direction of the
users.

## C.

Once the district court concluded that the moderators
were not LiveJournal's agents (except for its employee
Delzer), it proceeded to address the two remaining disputed
requirements for establishing the § 512(c) safe harbor
defense–lack of knowledge of infringements and lack of any
financial benefit from infringement that it had the right and
ability to control.  Because these issues may be contested on
remand, we proceed to address them to provide guidance to
the district court.

### 1.

If LiveJournal shows that it meets the threshold requirement for the § 512(c) safe harbor because the photographs were posted at the direction of the user, LiveJournal must then show that it lacked both actual and red flag knowledge of the infringements. *See* 17 U.S.C. § 512(c)(1)(A). Actual knowledge refers to whether the service provider had subjective knowledge while red flag knowledge turns on whether a reasonable person would objectively know of the infringements. *Shelter Capital*, 718 F.3d at 1025 (quoting *YouTube, Inc.*, 676 F.3d at 31). Both actual and red flag knowledge refer to knowledge of the specific infringement alleged. *Id.* at 1023, 1025.

On remand, the fact finder must first determine whether LiveJournal had actual knowledge of the infringements. A copyright holder's failure to notify the service provider of infringement through the notice and takedown procedure, as Mavrix failed to do here, "strip[s] it of the most powerful evidence of [actual] knowledge." *Id.* at 1020 (quoting *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004)). Such evidence is powerful, but not conclusive, towards showing that a service provider lacked actual knowledge. *Id.* at 1021. The district court held that LiveJournal lacked actual knowledge of the infringing nature of Mavrix's photographs solely on the basis of Mavrix's failure to notify LiveJournal of the infringements. This was an incomplete assessment of the issue. To fully assess actual knowledge, the fact finder should also assess a service provider's subjective knowledge of the infringing nature of the posts. *See, e.g.*, *id.* at 1025 (continuing to assess knowledge). Although Delzer does not remember approving the posts and for this reason can be said to lack actual

knowledge, Mavrix has not had the opportunity to depose the moderators to determine their subjective knowledge.  On remand, the fact finder should determine whether LiveJournal, through its agents, had actual knowledge of the infringing nature of the posts.

In the event the fact finder determines that LiveJournal lacked actual knowledge of the infringements, it must then assess whether LiveJournal lacked red flag knowledge.  Red flag knowledge arises when a service provider is "aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person."  *Fung*, 710 F.3d at 1043 (quoting *YouTube*, 676 F.3d at 31); *see also UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009) (describing red flag knowledge as a "high bar").  The infringement must be immediately apparent to a non-expert.  *See Veoh Networks Inc.*, 665 F. Supp. 2d at 1108; H.R. Rep. 105-551, pt. 2 at 58 (1998) (explaining that infringements must be "apparent from even a brief and casual viewing").  Some of the photographs at issue in this case contained either a generic watermark[13] or a watermark containing Mavrix's website, "Mavrixonline.com."[14]  To determine whether LiveJournal

---

[13] Congress explained that red flag knowledge includes "customary indicia . . . such as a standard and accepted digital watermark." H.R. Rep. 105-55, pt. 1, at 25 (1998). *But see Veoh Networks Inc.*, 665 F. Supp. 2d at 1115 (declining to rely on this report because it addressed a "version of the DMCA that is significantly different in its text and structure than the version that Congress ultimately adopted").

[14] The district court stated that Delzer was unaware that Mavrix had a website so photographs containing a "Mavrixonline.com" watermark did not differ from the other photographs with a more generic watermark.  To the extent that the district court relied on Delzer's purported lack of

had red flag knowledge, the fact finder should assess if it
would be objectively obvious to a reasonable person that
material bearing a generic watermark or a watermark
referring to a service provider's website was infringing.

### 2.

Finally, if the fact finder determines that LiveJournal met
the § 512(c) safe harbor threshold requirement (i.e., that the
photographs were posted at the direction of the user, *see*
17 U.S.C. § 512(c)(1)), and that LiveJournal lacked
knowledge of the infringements (*see* 17 U.S.C.
§ 512(c)(1)(A)), then the fact finder should determine
whether LiveJournal showed that it did not financially benefit
from infringements that it had the right and ability to control.
*See* 17 U.S.C. § 512(c)(1)(B).

We agree with the district court in *Io Group, Inc. v. Veoh
Networks, Inc.* that the fact finder should consider the service
provider's procedures that existed at the time of the
infringements when assessing the service provider's right and
ability to control the infringements.  586 F. Supp. 2d 1132,
1153 (N.D. Cal. 2008).  The fact finder should consider the
service provider's general practices, not its conduct with

---

knowledge that Mavrix had a website to suggest that Delzer lacked
knowledge of the infringements, this was error.  The existence of a
watermark, and particularly this watermark with a company name, is
relevant to the knowledge inquiry.

respect to the specific infringements.[15]  *See Shelter Capital*, 718 F.3d at 1023, 1030.

"Right and ability to control" involves "something more than the ability to remove or block access to materials posted on a service provider's website." *Id.* (quoting *YouTube, Inc.*, 676 F.3d at 38).  The service provider does "something more" when it exerts "high levels of control over activities of users." *Id.*  The service provider exerts "high levels of control," for example, when it, "prescreens sites, gives them extensive advice, prohibits the proliferation of identical sites," provides "detailed instructions regard[ing] issues of layout, appearance, and content," and ensures "that celebrity images do not oversaturate the content." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1173, 1182 (C.D. Cal. 2002); *see also Shelter Capital*, 718 F.3d at 1030, *cited with approval in Perfect 10*, 213 F. Supp. 2d 1146.[16]

The district court concluded that LiveJournal did not have high levels of control such that it had "something more" than the right and ability to remove or block access to material posted on ONTD.  LiveJournal's rules instruct users on the substance and infringement of their posts.  The moderators

---

[15] This inquiry is different from both the threshold determination (i.e., whether the infringing material was posted at the direction of the user, *see* 17 U.S.C. § 512(c)(1)), and the knowledge showing (i.e., whether the service provider had knowledge of the infringing material, *see* 17 U.S.C. § 512(c)(1)(A)), where the fact finder should focus on the specific infringements, rather than on the service provider's general practices and procedures.

[16] "Right and ability to control" may also be shown by intentional inducement of infringement, but we agree with the district court that inducement is not at issue here.  *Shelter Capital*, 718 F.3d at 1030.

screen for content and other guidelines such as infringement. Nearly two-thirds of submitted posts are rejected, including on substantive grounds. ONTD maintains a list of sources that have complained about infringement from which users should not submit posts. LiveJournal went so far as to use a tool to automatically block any posts from one source. In determining whether LiveJournal had the right and ability to control infringements, the fact finder must assess whether LiveJournal's extensive review process, infringement list, and blocker tool constituted high levels of control to show "something more."

LiveJournal must also show that it did not derive a financial benefit from infringement that it had the right and ability to control. *See* 17 U.S.C. § 512(c)(1)(B). "In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one." S. Rep. No. 105-190, at 44 (1998). The financial benefit need not be substantial or a large proportion of the service provider's revenue. *Ellison*, 357 F.3d at 1079. In *Fung*, we held that a financial benefit was shown when "there was a vast amount of infringing material on [the service provider's] websites . . . supporting an inference that [the service provider's] revenue stream is predicated on the broad availability of infringing materials for [its] users, thereby attracting advertisers." 710 F.3d at 1045. On the other hand, the service provider in that case "promoted advertising by pointing to infringing activity" and "attracted primarily visitors who were seeking to engage in infringing activity, as that is mostly what occurred on [the service provider's] sites." *Id.*

LiveJournal derives revenue from advertising based on the number of views ONTD receives. Mavrix presented

evidence showing that approximately 84% of posts on ONTD contain infringing material, although LiveJournal contested the validity of this evidence.   The fact finder should determine whether LiveJournal financially benefitted from infringement that it had the right and ability to control.

## D.

Mavrix also challenges the denial of its motions to compel responses to interrogatories seeking the identities of the moderators.   The magistrate judge denied both of Mavrix's motions, and on review, the district court upheld the denial, reasoning that the moderators had a First Amendment interest in internet anonymity.   When a district court denies reconsideration of a pretrial discovery order under Federal Rules of Civil Procedure 72(a), our review is deferential.   Upon review of such a ruling we will disturb it only if the complaining party shows clear legal error and actual and substantial prejudice.  *See Arizona v. City of Tucson*, 761 F.3d 1005, 1009 n.2 (9th Cir. 2014); *In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011) (describing the standard as "highly deferential").   In determining whether First Amendment protections for anonymous speech outweigh the need for discovery, we have applied a multi-factor balancing test.  *See, e.g.*, *In re Anonymous Online Speakers*, 661 F.3d at 1174–76 (describing balancing factors).

Notwithstanding the deferential standard of review and complex issues of law that govern this discovery ruling, we vacate the district court's order denying the motion and remand for further consideration.   Whether the moderators are agents should inform the district court's analysis of whether Mavrix's need for discovery outweighs the moderators' interest in anonymous internet speech. Given the

importance of the agency analysis to the ultimate outcome of the case, and the importance of discovering the moderators' roles to that agency analysis, the district court should also consider alternative means by which Mavrix could formally notify or serve the moderators with process requesting that they appear for their deposition at a date and time certain.

## IV.

For the foregoing reasons, we reverse the district court's grant of summary judgment to LiveJournal, vacate its order denying discovery, and remand for further proceedings consistent with this opinion.

**REVERSED, VACATED and REMANDED.**